[Cite as *State v. Nitsche*, 2016-Ohio-3170.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103174**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LUIS A. NITSCHE

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED IN PART; REVERSED IN PART;
REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-581917-A

**BEFORE:** E.A. Gallagher, J., Jones, A.J. and Laster Mays, J.

**RELEASED AND JOURNALIZED:** May 26, 2016

**ATTORNEY FOR APPELLANT**

Brian R. McGraw
55 Public Square, Suite 2100
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Christopher D. Schroeder
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN A. GALLAGHER, J.:

{¶1} Defendant-appellant Luis Nitsche appeals his convictions and sentences for aggravated murder, attempted murder, aggravated robbery and associated firearm specifications in connection with two shootings — the December 23, 2013 shooting of Berry Dean and the January 17, 2014 shooting of Lawelden McDowell — for which he was sentenced to an aggregate prison term of life without the possibility of parole plus 20 years. Nitsche argues that the trial court erred in denying his motion to sever the charges related to the two shootings. He also claims that the witnesses who testified against him were not credible and that his convictions were, therefore, against the manifest weight of the evidence. With respect to the sentences he received, Nitsche claims that the trial court violated his Eighth Amendment rights and abused its discretion in sentencing him to life without the possibility of parole on the aggravated murder count without taking into account his "young age" at the time he committed his crimes. Nitsche also contends that the trial court erred in considering his gang affiliation at sentencing, in imposing consecutive three-year sentences for the firearm specifications associated with Nitsche's convictions for attempted murder and aggravated robbery and in ordering Nitsche to pay $2,880 in restitution to McDowell's family for McDowell's funeral expenses. For the reasons that follow, we reverse the restitution order, remand for the trial court to consider Nitsche's present and future ability to pay restitution and affirm Nitsche's convictions and sentences in all other respects.

**Factual and Procedural Background**

{¶2} Nitsche's convictions arose out of two incidents — a December 23, 2013 incident in which Nitsche allegedly shot and paralyzed Berry Dean and a January 17, 2014 incident in which Nitsche allegedly shot and killed Lawelden McDowell. On January 29, 2014, a Cuyahoga County Grand Jury indicted Nitsche on a total of twelve counts related to the two incidents. Counts 1 through 5 — aggravated murder in violation of R.C. 2903.01(A) (Count 1), murder in violation of R.C. 2903.02(B) (Count 2), felonious assault in violation of R.C. 2903.11(A)(1) (Count 3), discharge of a firearm on or near prohibited premises (Count 4) and having weapons while under disability (Count 5) — related to the January 17, 2014 incident involving McDowell. Counts 6 through 12 — attempted murder in violation of R.C. 2923.02 and 2903.02(A) (Count 6), felonious assault in violation of R.C. 2903.11(A)(1) (Count 7), felonious assault in violation of R.C. 2903.11(A)(2) (Count 8), aggravated robbery in violation of R.C. 2911.01(A)(1) (Count 9), aggravated robbery in violation of R.C. 2911.01(A)(3) (Count 10), having weapons while under disability (Count 11) and discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) (Count 12) — related to the December 23, 2013 incident involving Dean. Counts 1 through 4, Counts 6 through 10 and Count 12 each carried one-year and three-year firearm specifications.

{¶3} Nitsche pled not guilty. Prior to trial, Nitsche filed a motion to sever the counts relating to the two incidents from one another. Nitsche argued that he would be prejudiced if the offenses related to the two incidents were tried together, asserting that

the jury would be unable to sort through the cumulative evidence of both incidents to render a fair verdict on each count individually and that he would be unable to assert all of his "best defenses" because they would "conflict with one another." The state opposed the motion and the trial court denied it. On the morning of trial, Nitsche moved for reconsideration of the trial court's ruling on his motion to sever. The trial court denied Nitsche's motion for reconsideration.

{¶4} Nitsche waived a jury trial on the having weapons while under disability charges (Counts 5 and 11), and the remaining counts were tried to a jury. A summary of the evidence pertinent to the issues raised in Nitsche's appeal follows.

{¶5} In late September or early October 2013, Maryann Jackson met Nitsche, also known as "Yellow," through a friend, Karen Osborn. By November 2013, Nitsche was her boyfriend. Jackson described her relationship with Nitsche as "crazy," i.e., "one minute we can be cool and then the next minute we're not," "[a]rguing, fighting, stuff like that." Although she and Nitsche were purportedly "exclusive," while dating Jackson, she also began seeing and "talking with" McDowell, who was also known as "Woo."

{¶6} On the evening of December 22, 2013, Jackson went out drinking with McDowell. Jackson testified that Nitsche had apparently been informed that she had been out with someone else because when she came home, Nitsche called her and said "b****, come get me right now." Jackson drove to Clark Avenue in Cleveland to pick Nitsche up and the couple immediately began arguing. Jackson stated that Nitsche was upset because another man had dropped her off and he wanted to know with whom she

had been. She testified that when they arrived at Jackson's apartment on Loop Drive in Cleveland, they continued arguing and that Nitsche was "acting crazy," knocking over Jackson's furniture and other belongings. Although she initially denied it, Jackson ultimately admitted to Nitsche that she had been out with someone else. Jackson testified that Nitsche demanded that she identify the other man she had been seeing. When Jackson refused, Nitsche told her to call that man.

{¶7} Jackson testified that, at first, she refused but Nitsche persisted and told her she had "better call them." Because she did not want to disclose that she had been out with McDowell, Jackson dialed a "random number" stored in her cell phone contacts list. That number was Dean's. Jackson and Dean had gone to middle school together and, more recently, had run into each other at a club on West 6th Street. Dean testified that after meeting at the club, he and Jackson had talked on the phone a couple of times but that, prior to December 23, 2013, he had not heard from Jackson "for a while."

{¶8} Jackson testified that after she dialed Dean's number, she hung up and told Nitsche that he didn't answer. Nitsche told her to call Dean again. At approximately 2:00 or 3:00 a.m. on December 23, 2013, Jackson called Dean again and he answered. Following Nitsche's directive, Jackson told Dean "to come back and come get me." Jackson testified, however, that she did not actually want Dean to come over because she had not been out with Dean; she had been out with McDowell. Jackson stated that although she had asked Dean to come over, she knew Dean "wasn't coming to my house or anything like that" because Dean had never been to her apartment and did not know

her address. Nevertheless, she told Nitsche that Dean was "on his way." Nitsche and Jackson sat and waited for Dean.

{¶9} When Dean did not arrive promptly, Nitsche told Jackson to call Dean again. Jackson testified, that once again, she followed Nitsche's directive and called Dean. Dean answered, but Jackson "acted like he didn't," so Nitsche then demanded that she text Dean. Jackson texted Dean and Dean replied, but Jackson ignored his response. Jackson testified that she did what Nitsche told her to do because he was "sitting right there watching me" and she was "lightweight scared * * * [b]ecause of what he might do." Nitsche then took Jackson's phone and texted Jackson's address to Dean himself.

{¶10} Dean testified that he received numerous texts from Jackson in the early morning hours of December 23, 2013, asking him to come to her home and provided her address. In response to her texts, he left his home in Cleveland Heights and drove to her apartment.

{¶11} Jackson testified that after Nitsche texted her address to Dean, she lied and told Nitsche that Dean was outside and she then ran outside and called Dean. Jackson testified that Dean answered and that she told him not to come and that she would see him the following day. Jackson explained that she told Dean not to come to her apartment because she was worried that Dean would tell Nitsche that Jackson had not been out with him and that she would then have to disclose to Nitsche who she had really been seeing, i.e., McDowell.

{¶12} Jackson testified that when Dean did not arrive, Nitsche took Jackson's phone, called Dean's number and handed the phone to Jackson. Jackson spoke to Dean and asked him where he was. Dean told her that he was on his way and Jackson and Nitsche then waited outside for him. Dean testified that he spoke with Jackson several times while he was driving to her apartment but that he did not recall what was said during those calls.

{¶13} Dean testified that when he reached Jackson's apartment, he parked on the street. He started walking towards the building in which he believed Jackson resided and saw Jackson appear from the opposite side of the building. He testified that as soon as he saw Jackson's face, he knew something was wrong. He turned around to leave but, in that "split second," he was shot. Dean testified that after he was shot, he "[i]nstantly * * * went paralyzed from the waist down" and fell to the ground. Dean stated that the shooter, a male with a light-skinned complexion wearing a hoodie and a black ski mask, stood over him pointing a gun at his face. The shooter reached down, took Dean's cell phone from his hand and his wallet from his back pocket. The shooter and Jackson then ran off. Dean testified that he did not know the person who had shot him.

{¶14} Jackson testified that, as she approached Dean, he called out her name. She saw Nitsche come up from behind Dean and shoot him once. Jackson testified that after he shot Dean, Nitsche told her to get her car and meet him at the "back of the Loop." Jackson did as Nitsche instructed. She testified that she did nothing to help Dean and

did not call the police or EMS "[b]ecause I was with Yellow." After the shooting, Jackson and Nitsche went to Osborn's apartment and while they were driving to Osborn's apartment, Nitsche was talking on his cell phone, cussing and saying, "I just had to shoot this n**** over her, stuff like that." Jackson and Nitsche stayed at Osborn's apartment until morning. The next morning, Jackson dropped Nitsche off on Clark Avenue in Cleveland.

{¶15} Dean testified that after Jackson and Nitsche ran off, he put his car keys in his mouth, dragged himself into the street and crawled towards his car using his arms to pull his body forward. As he crawled towards his vehicle, a police car approached. Dean waved down the police car and Cuyahoga Metropolitan Housing Authority ("CMHA") police officer Demetrius Jackson stopped and provided assistance. Officer Jackson testified that he found Dean lying in the street near 2768 Loop Drive, bleeding and in pain, unable to move the lower half of his body. Dean told Officer Jackson what had happened, provided a description of the shooter and Officer Jackson called for an ambulance, talking with Dean until the ambulance arrived. After Dean was placed in the ambulance, he passed out. He awoke at MetroHealth Hospital. Dean underwent seven surgeries and was hospitalized for nearly two-and-a-half months. He is paralyzed and wheelchair bound as a result of the shooting. The bullet with which Dean was shot remains lodged in his spine.

{¶16} CMHA police investigated the shooting of Dean. Detective Robert Weis, one of the CMHA detectives involved in the investigation, testified that, later that

morning, CMHA officers recovered a spent nine-millimeter shell casing at the Loop Drive crime scene and obtained a statement from Jackson identifying Nitsche as the person who had shot Dean. Jackson admitted that she did not immediately tell the police that Nitsche had shot Dean. She testified that it was only after the police told her that they did not believe she had not seen the shooter and read Jackson her *Miranda* rights that she identified Nitsche as the person who shot Dean. Weis testified that he investigated whether there were any working cameras in the area that could have captured the shooting of Dean but found none. Based on Jackson's statement, CMHA police undertook efforts to locate Nitsche and a warrant was issued for his arrest later that day, i.e., on December 23, 2013.

{¶17} Jackson testified that although she had ended her relationship with Nitsche after he shot Dean, she continued seeing McDowell. At that time, McDowell had a girlfriend, Brittney Gardner. On the evening of January 16, 2014, Jackson was with McDowell, Osborn and McDowell's best friend, Donald Wylie, who was also known as "Don Don." At approximately 8:00 or 9:00 p.m., McDowell and Wylie picked up Osborn and Jackson at Osborn's apartment at 8201 Madison Avenue in Cleveland and the group rode in McDowell's car, "riding around" with "no particular destination."

{¶18} Wylie testified that he had been with McDowell the entire day and acknowledged that earlier in the day, he and McDowell had been "getting high," "kicking back, having a good time." He indicated that he and McDowell had smoked "[a]bout three, four blunts" that day but that they "were done doing what we was doing" when they

were riding around in the car with Jackson and Osborn. He later admitted, on cross-examination, that they had been "getting high all night." Wylie testified that McDowell and Jackson were "romantically involved" but that "it wasn't that serious" "[b]ecause Woo still had Brittney [sic] and [Jackson] was still talking to Yellow."

{¶19} Osborn testified that while the group was "riding around," she received calls on her cell phone from Nitsche. She explained that Nitsche could not reach Jackson directly because Jackson had left her cell phone at Osborn's apartment when they went out. Osborn stated that she knew the calls were from Nitsche because she recognized his phone number and that, at first, she simply ignored the calls.

{¶20} At some point during the evening however, Osborn answered her phone when Nitsche called, placing her phone on speaker so that others in the vehicle could hear their conversation. Osborn testified that she recognized Nitsche's voice and that Nitsche told her Jackson was pregnant with his child. Osborn stated that Nitsche asked Osborn who Jackson was with and began "mak[ing] threats." Osborn testified that Nitsche said he "was going to f*** her up wherever we're at" and "kept saying" that he was coming over to Osborn's apartment.

{¶21} Osborn testified that McDowell, who had been listening to their conversation via the speaker phone, asked Nitsche whether he and Jackson were "still messing around and talking like in a relationship" and that Nitsche replied that they were. She indicated that McDowell told Nitsche that he and Jackson had been "talking" as well and that Nitsche then asked McDowell whether he had a sexual relationship with

Jackson. According to Osborn, McDowell handed the phone to Jackson so that she could answer Nitsche's question but she refused. Osborn testified that Jackson "wouldn't say nothing" and kept pushing the phone away. According to Jackson, McDowell told Nitsche that he and Jackson had been seeing each other for a couple months and confirmed that they had a sexual relationship.

{¶22} Brittney Gardner, McDowell's girlfriend, also called Osborn's cell phone that evening. Wylie testified that, at some time earlier that evening, Jackson and McDowell had been arguing and that Jackson went to McDowell's house to confront Gardner and inform her that she and McDowell were "messing with each other." According to Jackson, she went to Gardner's house to show Gardner "who Woo was with that night." McDowell, Osborn and Wylie were present and witnessed the argument that ensued between Gardner and Jackson. Osborn testified that Jackson knocked on the front door and that when Gardner answered it, the two women began "exchanging words." Before the exchange could became physical, McDowell broke it up and Gardner went back into her house.

{¶23} After Gardner went inside, Jackson and Osborn left and drove back to Osborn's apartment. Approximately ten minutes later, Gardner arrived at Osborn's apartment with several of her friends. Once again, Jackson and Gardner were arguing until McDowell arrived. Gardner and her friends then got into her car and left. Osborn and Jackson got into McDowell's car and rode around with McDowell and Wylie.

**{¶24}** Wylie testified that in response to Jackson's confrontation with Gardner, McDowell called Nitsche to "talk it out." He indicated that, at first, Nitsche and McDowell were "mad" and were simply "arguing back and forth." By the second call, however, it appeared to Wylie — based on what he heard from McDowell's side of the conversation — that "[t]hey was kind of talking it out for real" and that things no longer seemed "that serious." Wylie testified that after the second call, he believed things had calmed down and that everything was "okay" between McDowell and Nitsche.

**{¶25}** Osborn testified that when Gardner called her, she informed Osborn that she had thrown out McDowell's belongings and "f***** up" Jackson's car. The group then returned to Osborn's apartment. Wylie testified that by this time, it was in the early morning hours of January 17, 2014. When they arrived, they discovered that McDowell's clothing had been cut up, covered in mustard or mayonnaise and scattered across the yard and street in front of Osborn's apartment building.

**{¶26}** Jackson testified that she decided to call the police and went inside Osborn's apartment to retrieve her cell phone. Meanwhile, Osborn, Wylie and McDowell began picking up McDowell's clothing and placing it in the trunk of his car. Osborn and Wylie testified that as they were collecting McDowell's belongings, Nitsche walked around the corner of the apartment building, slipped and fell, and then got up and walked toward McDowell. Wylie testified that when he saw Nitsche, he asked him, "you ain't on no bulls***?" Wylie indicated that Nitsche replied that he "ain't on no bull***" and that he just wanted to talk to Jackson. Wylie testified that because he had

known Nitsche "since he was a kid," i.e., since Nitsche was 11 or 13, he "put [his] guard down" and continued picking up McDowell's clothing until he heard a "[p]ow." Wylie testified that he heard a single shot. He did not see who fired the shot but stated that when he looked up, he saw McDowell running past him and Nitsche holding a gun, pointing the gun in his face, approximately three to four feet away from him. Wylie testified that, at the time, he did not realize McDowell had been shot. Nitsche tried to squeeze the trigger, but the gun jammed. Wylie then "took off and ran." Wylie testified that he was running with McDowell until McDowell "just started falling."

{¶27} Osborn testified that when Nitsche approached, he told McDowell, "I got to talk to you. I'm not on no bull s* * *." When Nitsche was within arm's length of McDowell, he pulled out a gun and fired a single shot, striking McDowell. She stated that she "seen like little fire came out of the barrel of the gun when he shot [it]." According to Osborn, McDowell and Wylie ran and Nitsche turned the gun on her. He told her, "you better not say nothing or I [will] kill you too," then he ran off through a nearby field in the direction from which he had originally come. Osborn screamed for Jackson. When Jackson came outside, she and Osborn ran around the corner of the apartment building and found McDowell who had collapsed face first on the ground. Osborn testified that she called 911 but that because they were concerned the paramedics would not arrive in time, she, Jackson and Wylie lifted McDowell up, laid him across the back seat of his car and drove to MetroHealth Hospital. Shortly after he arrived at the emergency room, McDowell was pronounced dead. Cuyahoga County medical

examiner Dr. Thomas Gilson testified that McDowell died as a result of blood loss from a gunshot wound to the chest.

{¶28} Patrol Officer Mark Maguth with the Cleveland Police Department was dispatched to MetroHealth Hospital to investigate the shooting. He testified that when he arrived at the hospital, McDowell was not breathing and doctors were attempting to resuscitate him. McDowell died before Officer Maguth could speak with him. Osborn spoke with Officer Maguth at the hospital and told him that Nitsche had shot McDowell. Later that morning, she gave a written statement to homicide detectives in which she again identified "Yellow" as the shooter. Osborn testified that she told the police she had known "Yellow" for "[a] few years" and that she knew his "real name" as "Nitsche Luis." She also identified Nitsche in court as the person who had shot McDowell.

{¶29} Wylie gave a similar statement to the police, informing them that Nitsche had shot and killed McDowell, and identified Nitsche in court as the person who shot McDowell. Jackson also gave a statement to police. She testified that she did not see who shot McDowell.

{¶30} James Raynard, a crime scene technician and Thomas Armelli, a homicide detective, both with the Cleveland Police Department, testified that when they went to the crime scene shortly after McDowell had been shot, they recovered a fired bullet pellet consistent with 9 mm ammunition. Detective Armelli testified that the police were unable to determine whether the bullet recovered at the scene of the McDowell shooting was

fired from the same gun as the shell casing recovered at the scene of the Dean shooting. Nitsche was arrested on January 18, 2014.

{¶31} Yolanda Goodwin, a "mutual friend" of Jackson, Osborn, Wylie, McDowell and Nitsche, testified that before McDowell was shot, Nitsche had told her that he and Jackson were "together" and that Jackson was pregnant. She testified that she also spoke with Nitsche "right after the shooting" and that Nitsche then told her that he had shot McDowell and that he had also tried to shoot Osborn but that the gun jammed. Goodwin stated that when she first spoke with Nitsche on the morning of January 17, 2014, Nitsche did not know whether McDowell was dead or alive.

{¶32} Goodwin testified that after she spoke with Nitsche, she spoke with Jackson. Goodwin testified that Jackson had told her what had happened to McDowell. After speaking with Jackson, Goodwin called Nitsche and spoke with him a second time about the killing. Goodwin gave a written statement to police nine months later, in October 2014.

{¶33} No gun was recovered that could be linked to the shootings of McDowell or Dean. No hoodie was recovered that matched the description of the one Nitsche was wearing at the time of the shootings. Lisa Moore, a DNA analyst with the Cuyahoga County Medical Examiner's Office and Curtiss Jones, supervisor of its trace evidence department, testified that human blood was found on the tread of one of the boots Nitsche was wearing at the time of his arrest. However, no DNA evidence, gun shot residue, fingerprint evidence or any other physical evidence was recovered connecting Nitsche to

the crime scenes near 2768 Loop Drive or 8201 Madison Avenue or the shootings of Dean or McDowell.

{¶34} At the close of the state's case, Nitsche moved for acquittal on all counts of the indictment pursuant to Crim.R. 29(A), arguing that the state had failed to prove Nitsche's guilt beyond a reasonable doubt as to any of the counts. The trial court granted the motion as to Counts 4 and 12, discharge of a firearm on or near prohibited premises, and denied the motion as to the remaining counts.

{¶35} No witnesses testified for the defense. After the defense rested, Nitsche renewed his Crim.R. 29(A) motion as to the remaining counts of the indictment. The trial court denied the motion and after receiving instructions from the trial court, the jury began its deliberations.

{¶36} With respect to the counts related to the shooting of McDowell, the jury found Nitsche guilty of aggravated murder (Count 1), murder (Count 2) and felonious assault (Count 3) along with the associated firearm specifications. With respect to the counts related to the shooting of Dean, the jury found Nitsche guilty of attempted murder (Count 6), felonious assault (Counts 7 and 8), aggravated robbery in violation of R.C. 2911.01(A)(1) (Count 9) and the associated firearm specifications but not guilty of aggravated robbery in violation of R.C. 2911.01(A)(3) (Count 10). The trial court found Nitsche guilty of the two having weapons while under disability counts (Counts 5 and 11). Following the verdicts, Nitsche renewed his motion for acquittal pursuant to

Crim.R. 29(C). Once again, the trial court denied the motion and immediately proceeded with sentencing.

{¶37} Nitsche's convictions for aggravated murder, murder and felonious assault merged for sentencing and the state elected to proceed to sentencing on the aggravated murder count. The one-year and three-year firearm specifications associated with each of the counts merged into a single three-year firearm specification. On the aggravated murder count, the trial court imposed a sentence of life in prison without the possibility of parole plus three years for the firearm specification, to be served consecutively. Nitsche's convictions for attempted murder and felonious assault merged for sentencing and the state elected to proceed to sentencing on the attempted murder count. The one-year firearm specifications on the attempted murder and aggravated robbery counts merged into the three-year firearm specifications for each count. The trial court sentenced Nitsche to 11 years on the attempted murder count and three years on the associated firearm specification, to be served consecutively, three years on the aggravated robbery count, to be served concurrently with the sentence on the attempted murder count and another three years on the firearm specification associated with the aggravated robbery charge, to be served consecutively to the sentences on the remaining counts. The trial court also sentenced Nitsche to five years mandatory postrelease control. On each of the having weapons while under disability counts (Counts 5 and 11), the trial court imposed a sentence of 24 months, to be served concurrently to the sentences on the other counts. Thus, Nitsche was sentenced to an aggregate prison sentence of life

without the possibility of parole plus 20 years (11 years on the attempted murder count plus three consecutive three-year sentences on the three-year firearm specifications).[1]

**{¶38}** The trial court did not impose a fine and waived court costs "based on the indigency of the defendant." However, the trial court ordered that Nitsche pay $2,880 in restitution to McDowell's family "for the funeral bill." Nitsche objected to the "restitution issue" but did not dispute the amount of the funeral expenses.

**{¶39}** This appeal followed. Nitsche has raised the following six assignments of error for review:

> ASSIGNMENT OF ERROR NUMBER 1:
> Six years for consecutive firearm specifications for aggravated robbery and attempted murder in the shooting [of] Berry Dean is error.
>
> ASSIGNMENT OF ERROR NUMBER 2:
> The trial court erred in ordering restitution.
>
> ASSIGNMENT OF ERROR NUMBER 3:
> The court's failure to consider Nitsche's young age in imposing a sentence of life without parole violates his Eighth Amendment protection against cruel and unusual punishment.
>
> ASSIGNMENT OF ERROR NUMBER 4:
> The court erred in considering Nitsche's alleged gang affiliation when imposing sentence.
>
> ASSIGNMENT OF ERROR NUMBER 5:
> The manifest weight of the evidence was not established to allow for convictions in any of the crimes in either incident.
>
> ASSIGNMENT OF ERROR NUMBER 6:

---

[1] The firearm specifications associated with the having weapons while under disability count merged with the firearm specifications associated with the aggravated murder count.

The trial court abused its discretion in joining, in one trial, the Berry Dean and Lewaldon [sic] McDowell shooting incidents.

**{¶40}** For ease of discussion, we consider Nitsche's assignments of error out of order and together where appropriate.

**Law and Analysis**

**Manifest Weight of the Evidence**

**{¶41}** We address Nitsche's fifth assignment of error first. In his fifth assignment of error, Nitsche claims that all of his convictions should be overturned because they were against the manifest weight of the evidence.

**{¶42}** A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Weight of the evidence involves "the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing at *Thompkins* at 386-387. The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility and determine

whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175. This is not that case.

{¶43} Nitsche does not explain why he contends his convictions are against the manifest weight of the evidence other than to assert that the "cloudy and shaky testimony" of the "citizen witness[es]" offered by the state — i.e., Wylie, Jackson, Osborn, Dean and Goodwin — lacked credibility and should not have been believed by the jury. Nitsche contends that because the state's witnesses included "young people with extensive involvement with drug usage and the criminal justice system," their testimony "lacked the credibility that would allow the jury to 'rely upon it in the most important of your affairs.'" Nitsche's conclusory assertions that the witnesses who testified against him were not credible are insufficient to establish that his convictions were against the manifest weight of the evidence.

{¶44} Simply because certain witnesses had criminal histories or admitted using drugs or alcohol or to being "high" on the night of the incidents at issue does not mean

their testimony could not be relied upon to convict Nitsche. *See, e.g.*, *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 130 (credibility of witnesses in murder case was left to the jury where witnesses admitted they were high on crack cocaine the day of the murder and had "extensive criminal histories"); *State v. Medezma-Palomo*, 8th Dist. Cuyahoga No. 88711, 2007-Ohio-5723, ¶ 36-37 (fact that witnesses "were all consuming crack cocaine and heroin on a daily basis" and that several of the state's witnesses had criminal records did not preclude the jury from finding their testimony to be credible); *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716 and 11AP-766, 2012-Ohio-2989, ¶ 41 (fact that witnesses had criminal records and struggled with substance abuse did not render their testimony unreliable; jury could properly weigh information regarding witnesses' criminal histories and drug use in determining how much credibility to give their testimony).

{¶45} Likewise, a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory. *See, e.g., State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, citing *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11. The decision whether, and to what extent, to believe the testimony of a particular witness is "within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54.

**{¶46}** The witnesses answered questions regarding their criminal histories and alleged drug or alcohol use during their direct and cross-examinations. The jury heard Jackson admit that she had been drinking and was intoxicated the night Dean was shot and heard Wiley admit that he had an extensive criminal record and had been with McDowell "getting high" most of the day on which McDowell was shot. Defense counsel brought the inconsistencies in the witnesses' testimony, any questionable testimony by the witnesses and any potential biases on the part of witnesses to the jury's attention for their consideration. The jury was able to judge the credibility of the witnesses for themselves and was "free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Malone*, 8th Dist. Cuyahoga No. 101305, 2015-Ohio-2150, ¶ 29, citing *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

**{¶47}** Here, there was eyewitness testimony from persons present at the scene identifying Nitsche as the shooter in each of the two incidents. Jackson identified Nitsche as the person who shot Dean. Wylie and Osborn identified Nitsche as the person who shot McDowell. These witnesses were not strangers to Nitsche; they all knew him well. Jackson was Nitsche's former girlfriend. Osborn testified that she knew Nitsche "from around Madison [Avenue]" and that he was at one time a friend and "associate." Wylie testified that he had known Nitsche since he was 11 or 13 years old. In addition, Nitsche's friend, Goodwin testified that Nitsche admitted to her after the shooting that he had shot McDowell. All four witnesses also testified as to Nitsche's

motive for shooting Dean and McDowell — i.e., a jealous boyfriend (or ex-boyfriend) seeking vengeance against the new man with whom his girlfriend, allegedly pregnant with his child, had begun a relationship.

{¶48} After a careful review of the record in its entirety, we cannot say that this is one of those "exceptional cases" in which the trier of fact clearly lost its way and created such a manifest miscarriage of justice that Nitsche's convictions were against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Accordingly, Nitsche's fifth assignment of error is overruled.

{¶49} We now turn to Nitsche's challenges to the sentences he received.
**Challenge to Imposition of Consecutive Sentences on Firearm Specifications Associated with Attempted Murder and Aggravated Robbery Charges**

{¶50} In his first assignment of error, Nitsche contends that the trial court erred in imposing consecutive three-year sentences on the three-year firearm specifications associated with Nitsche's convictions for attempted murder and aggravated robbery in connection with the shooting of Dean.

{¶51} Nitsche acknowledges that this court has previously held that R.C. 2929.14(B)(1)(g) "allow[s] for multiple, consecutive firearm specifications to be imposed for a single incident." *See, e.g., State v. Lawrence*, 8th Dist. Cuyahoga Nos. 100371 and 100387, 2014-Ohio-4797, ¶ 12-16. However, he asks this court to reconsider its prior decisions and consider "the equities of imposing multiple firearm convictions for a single act." He further argues that "at the very least, a court should be required to undertake

consecutive sentencing analysis and justification" pursuant to R.C. 2929.14(C) before imposing consecutive firearm specifications under R.C. 2929.14(B)(1)(g). This court has already considered and rejected these arguments. Nitsche provides no justification for revisiting them here.

{¶52} Ordinarily, a trial court is prohibited from imposing more than one prison term for firearm specifications associated with felonies "committed as part of the same act or transaction." R.C. 2929.14(B)(1)(b). However, R.C. 2929.14(B)(1)(g) creates an exception that mandates the imposition of consecutive prison terms where a defendant is convicted of multiple firearm specifications under certain circumstances. *State v. Young,* 8th Dist. Cuyahoga No. 102202, 2015-Ohio-2862, ¶ 8-10. R.C. 2929.14(B)(1)(g) provides:

> *If an offender is convicted of* or pleads guilty to *two or more felonies*, *if one or more of those felonies are* aggravated murder, murder, attempted aggravated murder, *attempted murder*, *aggravated robbery*, *felonious assault*, or rape, *and if the offender is convicted of* or pleads guilty to *a specification of the type described under division (B)(1)(a) of this section* [a specification of the type described in R.C. 2941.141, 2941.144, or 2941.145], *in connection with two or more of the felonies*, *the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted* or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

(Emphasis added.)

{¶53} This court has construed R.C. 2929.14(B)(1)(g) to mean that in cases such as this, where the defendant was found guilty of two or more felonies (one of which was attempted murder) and those felony counts included firearm specifications — of which

the defendant was also convicted — the trial court is required to impose prison terms for the two most serious specifications and could also, in its discretion, impose a sentence for any other specification. *State v. James*, 8th Dist. Cuyahoga No. 102604, 2015-Ohio-4987, ¶ 41. This court has stated that although the General Assembly did not use the word "consecutive" in R.C. 2929.14(B)(1)(g), R.C. 2929.14(B)(1)(g) nevertheless created an exception to the general rule that a trial court may not impose multiple, consecutive firearm specifications for crimes committed as part of the same act or transaction. *See Young* at ¶ 9, citing *State v. Vanderhorst*, 8th Dist. Cuyahoga No. 97242, 2013-Ohio-1785, ¶ 10. As this court has explained:

> "The mandatory language of the statute ('the court shall impose') also indicates the General Assembly's intention that the defendant serve multiple sentences for firearm specifications associated with the enumerated crimes, such as [attempted murder, aggravated robbery] or felonious assault. Had the legislature intended a per se rule that sentences for firearm specifications must be served concurrent with one another, it could have stated as much. Or, the legislature could have chosen not to codify R.C. 2929.14(B)(1)(g), which serves as an exception to the rule that multiple firearm specifications must be merged for purposes of sentencing when the predicate offenses were committed as a single criminal transaction."

*Young* at ¶ 9, quoting *Vanderhorst* at ¶ 10, quoting *State v. Isreal*, 12th Dist. Warren No. CA2011-11-115, 2012-Ohio-4876, ¶ 71; *see also Lawrence*, 2014-Ohio-4797, at ¶ 14.

{¶54} In this case Nitsche was convicted of attempted murder, aggravated robbery and felonious assault— among other offenses — in connection with the shooting of Berry Dean. Each of those counts carried a one-year firearm specification pursuant to R.C. 2941.141(A) and a three-year firearm specification pursuant to R.C. 2941.145(A), and upon which the jury convicted. The trial court was, therefore, mandated by R.C.

2929.14(B)(1)(g) to impose sentences "for each of the two most serious specifications of which the offender is convicted," i.e., two of the three-year firearm specifications, consecutively. *Young* at ¶ 10; *Lawrence* at ¶ 14; *Vanderhorst* at ¶ 10. Because R.C. 2929.14(B)(1)(g) requires the imposition of consecutive sentences for the firearm specifications, the trial court was not required to make R.C. 2929.14(C)(4) findings before imposing multiple, consecutive three-year sentences on the firearm specifications associated with Counts 6 and 9. *Young* at ¶ 10, citing *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525, ¶ 21. "[T]he mandatory requirement to order consecutive service of certain specifications under R.C. 2929.14(B)(1)(g) supersedes the findings required by R.C. 2929.14(C)(4)." *James* at ¶ 46.

{¶55} Furthermore, R.C. 2929.14(C)(4) "applies to 'multiple prison terms [that] are imposed on an offender for convictions of multiple *offenses*[.]'" R.C. 2929.14(C)(4). A specification is a sentencing enhancement, not a separate criminal offense. Thus, "[b]y its own terms, R.C. 2929.14(C)(4) does not apply to penalty enhancing specifications." *James* at ¶ 47. Accordingly, the trial court did not err in convicting Nitsche of multiple three-year firearm specifications on the attempted murder and aggravated robbery counts or in imposing consecutive sentences for those firearm specification convictions without making R.C. 2929.14(C)(4) findings. Nitsche's first assignment of error is overruled.

**Challenges to Sentence on Aggravated Murder Charge**

{¶56} In his third and fourth assignments of error, Nitsche challenges the prison sentence of life without parole that the trial court imposed on the aggravated murder count. In his third assignment of error, Nitsche claims that the trial court violated his Eighth Amendment rights by sentencing him to life without the possibility of parole "due to his young age" or "at the very least" by not "acknowledg[ing] that his age was considered in the analysis of a just sentence." In his fourth assignment of error, Nitsche contends that the trial court erred in considering his alleged gang affiliation in imposing a life sentence without parole. Nitsche's arguments are meritless.

**Whether the Trial Court Violated the Eighth Amendment by Imposing a Life Sentence Without Parole Given Nitsche's "Young Age"**

{¶57} Nitsche's constitutional challenge to his life sentence without parole on the aggravated murder count is based on *Miller v. Alabama*, 567 U.S.__, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2012), and *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.2d 890.

{¶58} In *Miller*, the United States Supreme Court held that a sentencing scheme that mandates a sentence of life in prison without the possibility of parole for a juvenile homicide offender violates the Eighth Amendment's prohibition on cruel and unusual punishment. *Miller* at 2464. In *Roper*, the United States Supreme Court held that the Eighth and Fourteenth Amendments prohibit imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed. *Roper* at 578. In *Long*, the Ohio Supreme Court held that a trial court, in exercising its sentencing discretion for aggravated murder under R.C. 2929.03(A), "must separately consider the

youth of a juvenile offender as a mitigating factor before imposing a sentence of life without parole" and that "[t]he record must reflect that the court specifically considered the juvenile offender's youth as a mitigating factor at sentencing when a prison term of life without parole is imposed.'" *Long* at paragraphs one and two of the syllabus.

{¶59} Nitsche asserts that the same considerations that led the courts in these cases to conclude that juveniles "'are less deserving of the most severe punishments,'" *Miller* at 2464, quoting *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L.Ed.2d 825 (2010), should be applied to Nitsche, a "young adult * * * 'raised' dysfunctionally in America's urban cores."    We disagree.

{¶60} As the United States Supreme Court explained in *Miller*, juveniles are "constitutionally different from adults for purposes of sentencing":

> First, children have a "'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S. at 569, 125 S.Ct. 1183, 161 L.Ed.2d 1. Second, children "are more vulnerable * * * to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.* at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1. * * * [T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. * * * [I]n imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. * * *

*Miller* at 2464-2468.    The Ohio Supreme Court relied on *Miller* in reaching its decision in *Long*.    *Long* at ¶ 1, 11-14.

**{¶61}** Nitsche, however, is not a "juvenile offender." He was 23 years of age and had been an adult for five years at the time he committed the crimes at issue. Therefore, the considerations identified in *Miller* (and the other cases cited above) — which are based on the "significant gaps between juveniles and adults," *Miller* at 2464 — do not apply here.

**{¶62}** The Tenth District recently considered a similar argument in *State v. Phipps*, 10th Dist. Franklin No. 15AP-524, 2016-Ohio-663. In that case, the defendant — who was 19 at the time he committed the offenses at issue — pled guilty to 21 counts, including aggravated robbery and kidnapping, arising out of a series of robberies, burglaries and home invasions. *Id.* at ¶ 3, 35. He was sentenced to an aggregate prison term of 150 years. *Id.* at ¶ 3. The defendant argued, based on *Miller*, *Graham* and *Roper,* that the trial court erred in failing to consider his "relative youth" as a relevant factor under R.C. 2929.12 and that his youth should have been considered during sentencing because "he lacked * * * maturity and had an underdeveloped sense of responsibility." *Id.* at ¶ 33, 35. The Tenth District rejected the defendant's argument, noting that there was no authority to support the extension of *Roper*, *Graham* and *Miller* to the defendant, who was not a juvenile at the time he committed the offenses at issue. *Id.* at ¶ 37, 39. As the court explained:

> We are unaware of, and appellant fails to point to, any pertinent legal authority to support the extension of *Roper*, *Graham*, and *Miller* to persons who were not juveniles at the time of the commission of the offense. * * * [I]n *Roper*, *Graham*, and *Miller*, the United States Supreme Court explicitly referred to the age of 18 as the divide between juveniles and adults when considering developmental differences under the Eighth Amendment. * * *

The United States Supreme Court explained its use of the age of 18 to establish the divide as follows:

Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. * * * The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.
*Roper* at 574.

Following *Miller*, the Sixth Circuit considered whether to extend *Miller* to persons over the age of 18. *United States v. Marshall*, 736 F.3d 492 (6th Cir.2013). The court found that "[c]onsiderations of efficiency and certainty require a bright line separating adults from juveniles" and that "[f]or purposes of the Eighth Amendment, an individual's eighteenth birthday marks that bright line." *Id.* at 500. * * *

[O]n the facts of this case, we cannot agree that the trial court erred by refusing to consider appellant's age through extension of the holdings in *Roper*, *Graham*, and *Miller* in the determination of his sentence.

*Phipps* at ¶ 37-40; *see also State v. Rolland*, 7th Dist. Mahoning No. 12 MA 68, 2013-Ohio-2950, ¶ 15 ("*Roper*, *Graham* and *Miller* are inapplicable" to a defendant who was not a juvenile at the time of the commission of the offense because the protections at issue in those cases "apply only to juvenile offenders.")

{¶63} Like the defendant in *Phipps*, Nitsche "offers no persuasive justification for the extension of the reasoning" in *Roper*, *Miller* and *Long* to the facts of this case. *Id.* at ¶ 39. Although this case involves a sentence of life without the possibility of parole rather than a lengthy aggregate prison sentence, we believe the same reasoning applies. Nitsche's sentence of life imprisonment without the possibility of parole does not violate the Eighth Amendment's prohibition against cruel and unusual punishment.

**{¶64}** Furthermore, even if the trial court was constitutionally required to consider Nitsche's age prior to sentencing him to life without parole, the transcript from the sentencing hearing reflects that it did so. The trial court specifically noted during the sentencing hearing that "at the defendant's young age of now 25 he had already several prior criminal convictions." Specifically, the court found that the appellant was convicted in 2011 for domestic violence and attempted abduction and was sentenced to a 12– month prison term; in 2009 he was sentenced to a two year term of imprisonment for receiving stolen property of a motor vehicle and failure to comply with an order signal of a police officer, and in 2008, after violating the terms of probation for a charge of trafficking controlled substance, he was sentenced to a term of six months. Accordingly, Nitsche's third assignment of error is overruled.

### Consideration of Nitsche's Gang Affiliation During Sentencing

**{¶65}** In addition to his constitutional challenge, Nitsche argues that the trial court erred in considering his "alleged gang affiliation" when sentencing Nitsche on the aggravated murder count. Nitsche contends that the trial court made it clear at sentencing that "the reason" it imposed a sentence of life without parole on the aggravated murder charge was because Nitsche was a member of the "Heartless Felons" gang "even though there was no evidence/testimony in the case about that issue." He further asserts that Nitsche's "conduct in the crimes alleged does not explain the sentence he received" and that the trial court's imposition of a sentence of life without parole was

"unsubstantiated, unjustified, and an abuse of discretion." We have no authority to review Nitsche's sentence on this basis.

**{¶66}** R.C. 2953.08 governs the review of felony sentences. R.C. 2953.08(D)(3) provides: "A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." Thus, R.C. 2953.08(D)(3) expressly "excludes sentences imposed for aggravated murder * * * from appellate review." *State v. White*, 8th Dist. Cuyahoga No. 101576, 2015-Ohio-2387, ¶ 67-68 (defendant's claim that sentences imposed on murder and aggravated murder counts were contrary to law because trial court did not engage in a proportionality analysis was not subject to appellate review under R.C. 2953.08(D)(3)), citing *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 19. As this court has previously explained, "the general felony sentencing statutes are inapplicable to aggravated murder because 'aggravated murder is governed by a special statutory scheme, carries a mandatory punishment, is not classified by degree of felony, and is expressly exempted from * * * sentencing requirements inapplicable to felonies of lesser degrees.'" *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, ¶ 62, quoting *State v. Hollingsworth*, 143 Ohio App.3d 562, 567-568, 758 N.E.2d 713 (8th Dist.2001). Nitsche was sentenced for aggravated murder pursuant to R.C. 2929.02(A) and 2929.03. Accordingly, R.C. 2953.08(D)(3) applies.[2]

---

[2]Neither Nitsche nor the state addressed the applicability of R.C. 2953.08(D)(3) in their briefs.

**{¶67}** The Ohio Supreme Court has held that R.C. 2953.08(D)(3) is "unambiguous" and "clearly means what it says: such a sentence cannot be reviewed." *Porterfield* at ¶ 17; *see also Jackson* at ¶ 61-64 (rejecting defendant's claim that trial court failed to consider his mental illness as a mitigating factor under R.C. 2929.12, noting that "evidentiary review of a sentence imposed by a trial court pursuant to R.C. 2929.03(A)(1)(a) is precluded"); *State v. Hilliard*, 8th Dist. Cuyahoga No. 102214, 2015-Ohio-3142, ¶ 29-31 (defendant's claim that he was remorseful and had no prior criminal record, that his crime "stemmed from a failed relationship that seemed to have provoked [his] behavior" and that unspecified mitigating factors revealed in his psychological examination warranted a lesser sentence was not subject to appellate review under R.C. 2953.08(D)(3)); *State v. Hawkins*, 4th Dist. Gallia No. 13CA3, 2014-Ohio-1224, ¶ 10, 13-15 (appellate court lacked statutory authority to consider defendant's argument that sentence for aggravated murder was "unreasonable" because he "lived a primarily law-abiding life," was "a 'quiet, hard-working, decent person'" and his actions against victim were "an aberration from his normal, quiet self" under R.C. 2953.08(D)(3)); *State v. Jones*, 2d Dist. Clark No. 2012CA61, 2013-Ohio-4820, ¶ 26 ("Pursuant to R.C. 2953.08(D)(3) and case law interpreting this statute, this Court is without statutory authority to review appellant's sentence on an evidentiary basis."); *State v. Patterson*, 5th Dist. Stark No. 2012CA00098, 2013-Ohio-1647, ¶ 70 (same). Accordingly, pursuant to R.C. 2953.08(D)(3), we lack statutory authority to review Nitsche's sentence for aggravated murder on an evidentiary basis.

**{¶68}** Even if R.C. 2953.08(D)(3) were not a bar to review, we would still find no error in the trial court's consideration of Nitsche's gang affiliation here. Nitsche has not cited any authority in support of his claim that the trial court erred in considering his ties to the Heartless Felons gang when sentencing him. Nitsche does not dispute that he is a member of the Heartless Felons gang and did not object when the trial court referred to his gang affiliation during sentencing. In fact, the defense filed a motion in time to prohibit the state from "revealing any information that the defendant is gang affiliated with a group known as the 'heartless felons.'" The motion was granted. There was ample evidence in the record, however regarding Nitsche's ties to the Heartless Felons gang from a pretrial hearing that the trial court held on the state's motion to revoke Nitsche's non-attorney phone, visitation and mail privileges while in jail after Nitsche posed for an illicit in-jail photograph.[3]

**{¶69}** Furthermore, it is clear from the record that Nitsche's affiliation with the Heartless Felons gang was only one of many factors the trial court considered in imposing his sentence. The trial court's reference to Nitsche's gang affiliation followed a detailed discussion of Nitsche's criminal history, the reprehensibility of his conduct, his lack of concern for human life, the danger he posed to the public, his failure to take responsibility for his actions and his lack of remorse. As the trial court explained:

---

[3] The photograph — in which Nitsche flashed Heartless Felons gang signs with his hands — had been posted to social media by a third party with the caption: "If all my reall 1st n***** out u wouldn't even be able to brush my shoulders free yellow he say don't let them n***** breath out ther." Sic.

The Court has considered the record, and certainly the record includes the trial of this matter where the Court had first-hand knowledge of the testimony and the evidence presented against Mr. Nitsche and upon which the jury itself found him guilty as previously noted.

The Court has considered the oral statements made here today and the Court has considered the purposes and principles of sentencing under Revised Code Section 2929.11 and the seriousness and recidivism factors relevant to the offense and offender pursuant to Revised Code Section 2929.12, the need for deterrence, incapacitation, rehabilitation, and restitution.

To begin with, the Court would like to record the defendant's criminal history * * *.  So at the defendant's young age of now 25, he has already several prior convictions, criminal convictions. * * *

[W]ith regard to the aggravated murder, Count 1, just finding out that Mr. McDowell was the person who you believed then was actually seeing Mary Ann Jackson, within a matter of hours, if that, you decided to go and kill him, walk right up to him in front of his friends and shoot him in the chest. Then, according to the testimony of the witnesses, Karen and Don Don, you pointed the gun at them, and but for it jamming, you may have very well seriously injured or killed those other individuals who were there with him.

Your conduct is reprehensible.  It is despicable.  You have no concern for human life.  That's absolutely been shown.  Absolutely no concern for human life.  You are a danger to the public, and I have a sworn duty to protect the public.   Again, no remorse. * * *

And even though it did not come out in the trial, you are a Heartless Felon. You are proud of being a Heartless Felon.  You give the signs of being a Heartless Felon.  You are tattooed with it.  This is who you are, which is why I restricted your communications in jail.  You take pride in being a Heartless Felon.   And you try to impart fear in others that cross you.

And it's for that reason that on the count of aggravated murder, the Court is

imposing a sentence of life imprisonment without the possibility of parole *

* * *.

**{¶70}** Nitsche was convicted of aggravated murder in violation of R.C. 2903.01(A), which carries, in this case, a life sentence. R.C. 2929.02(A). Pursuant to R.C. 2929.03(A)(1)(a)-(d), the life sentence could be without parole eligibility or with parole eligibility after serving 20, 25 or 30 years in prison. In this case, Nitsche was sentenced to life in prison without the possibility of parole. Nitsche does not dispute that his sentence falls within the statutory range for aggravated murder. Nitsche's prison sentence is supported by the record and is not contrary to law. Accordingly, Nitsche's fourth assignment of error is overruled.

### Restitution

**{¶71}** In his second assignment of error, Nitsche argues that the trial court erred in ordering him to pay restitution to McDowell's family for the costs of his funeral.

**{¶72}** As an initial matter, we must first consider whether we have authority to review the trial court's restitution order under R.C. 2953.08(D)(3). As stated above, R.C. 2953.08(D)(3) provides: "A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." R.C. 2929.01(FF) defines a "sentence" as "the sanction or combination of sanctions imposed by the sentencing court on an offender who is convicted of or pleads guilty to an offense." A "sanction" is "any penalty imposed upon an offender who is convicted of or pleads guilty to an offense, as punishment for the offense" and "includes any sanction imposed pursuant to any provision of sections 2929.14 to 2929.18 * * * of the Revised Code." R.C. 2929.01(DD). Applying these

definitions, "sentence" as used in R.C. 2953.08(D)(3) encompasses restitution. Restitution is not, however, part of Nitsche's sentence imposed "pursuant to sections 2929.02 to 2929.06 of the Revised Code." Restitution is authorized pursuant to R.C. 2929.18. Accordingly, we conclude that R.C. 2953.08(D)(3) does not preclude our review of the trial court's restitution order in this case.

{¶73} We review a trial court's decision to order restitution for abuse of discretion. *State v. Maurer*, 8th Dist. Cuyahoga No. 103162, 2016-Ohio-1380, ¶ 12; *State v. McLaurin*, 8th Dist. Cuyahoga No. 103068, 2016-Ohio-933, ¶ 8.[4] An abuse of discretion implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

---

[4]In *State v. Marcum*, Slip Opinion No. 2016-Ohio-1002, ¶ 1, the Ohio Supreme Court, in "address[ing] the standard of review that appellate courts must apply when reviewing felony sentences," recently stated that when "[a]pplying the plain language of R.C. 2953.08(G)(2), * * * an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." The court's application of R.C. 2953.08(G)(2) in *Marcum* was limited to sentencing-term challenges. *See id.* at ¶ 7, 10 ("[W]e hold that appellate courts may not apply the abuse-of-discretion standard in sentencing-term challenges.") Prior to *Marcum*, this court applied R.C. 2953.08(G)(2) in reviewing sentencing-term challenges and applied an abuse of discretion standard in reviewing challenges to restitution orders. *See, e.g., State v. Maddox*, 8th Dist. Cuyahoga No. 99120, 2013-Ohio-3140, ¶ 23, 53; *compare State v. Collins*, 2015-Ohio-3710, 41 N.E.3d 899, ¶ 31 (12th Dist.) (holding that "R.C. 2953.08(G)(2) is the proper standard of review for all felony sentences" and that, therefore, the "proper standard of review for analyzing the imposition of restitution as a part of a felony sentence is whether the sentence complies with R.C. 2953.08(G)(2)(b)"). Since *Marcum* was decided, this court has continued to apply an abuse of discretion standard in reviewing restitution orders. *See Maurer* at ¶ 12. Accordingly, we apply an abuse of discretion standard in reviewing Nitsche's challenge to the restitution order in this case. Even if, however, the standard of review set forth in R.C. 2953.08(G)(2) applied, it would not change the result here.

**{¶74}** Pursuant to R.C. 2929.18(A)(1), a trial court may order an offender to pay restitution to the victim's family "in an amount based on the victim's economic loss" as part of a felony sentence. R.C. 2929.18(A)(1) provides, in relevant part:

> Except as otherwise provided in this division and in addition to imposing court costs pursuant to section 2947.23 of the Revised Code, the court imposing a sentence upon an offender for a felony may sentence the offender to any financial sanction or combination of financial sanctions authorized under this section * * * Financial sanctions that may be imposed pursuant to this section include, but are not limited to, the following:

> (1)   Restitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss. * * * If the court imposes restitution, at sentencing, the court shall determine the amount of restitution to be made by the offender. If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold a hearing on restitution if the offender, victim, or survivor disputes the amount. * * *

**{¶75}** "Economic loss" means "any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense" and specifically includes

"funeral expense incurred as a result of the commission of the offense." R.C. 2929.01(L).

**{¶76}** The fact that a defendant is indigent does not preclude a trial court from imposing financial sanctions, including restitution. *See, e.g., State v. Jennings,* 8th Dist. Cuyahoga No. 99631, 2013-Ohio-5428, ¶ 43. Likewise, the fact that a defendant is sentenced to a lengthy prison sentence "does not necessarily preclude the imposition of financial sanctions." *State v. Western*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 57 (2d Dist.); *see also State v. Fischer*, 2d Dist. Montgomery No. 25618, 2013-Ohio-4817, ¶ 21 (affirming restitution order in the amount of $6,025.18, imposed upon a defendant serving a 50-year prison sentence); *State v. Harwell*, 2d Dist. Montgomery No. 25852, 2015-Ohio-2966, ¶ 67-71 (trial court did not commit plain error when it ordered defendant sentenced to 32 years to life in prison to pay restitution in the amount of $3,891.65). For example, "[t]he possibility of working while in prison is one factor that a trial court can use in determining an inmate's ability to pay financial sanctions." *Western* at ¶ 55, quoting *State v. Croom*, 2d Dist. Montgomery No. 25094, 2013-Ohio-3377, ¶ 94.

**{¶77}** Nitsche concedes that his indigence did not preclude the trial court from ordering restitution. However, he argues that the trial court erred in ordering him to pay $2,880 restitution for McDowell's funeral expenses because (1) the state offered no "documentary proof" of McDowell's funeral bill at sentencing and (2) the trial court

failed to consider his "present or future ability to pay" restitution prior to ordering restitution.

{¶78} Prior to ordering restitution, "a sentencing court must engage in a 'due process ascertainment that the amount of restitution bears a reasonable relationship to the loss suffered.'" *McLaurin*, 2016-Ohio-933, at ¶ 13, quoting *State v. Borders*, 12th Dist. Clermont No. CA2004-12-101, 2005-Ohio-4339, ¶ 36. "The court must determine the amount of restitution to a reasonable degree of certainty, ensuring that the amount is supported by competent, credible evidence." *McLaurin* at ¶ 13, citing *State v. Warner*, 55 Ohio St.3d 31, 69, 564 N.E.2d 18 (1990). Pursuant to R.C. 2929.18(A)(1), if the court imposes restitution, it

> "may base the amount of restitution it orders on an amount recommended by the victim, * * * estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." A hearing on the issue of restitution need only be held "if the offender, victim, or survivor disputes the amount."

*Id.*

{¶79} In this case, the state submitted a receipt at sentencing evidencing the amount — $2,880 — McDowell's family paid for his funeral. It does not appear, however, that the state asked to have the receipt admitted into evidence as an exhibit at the sentencing hearing and it is not part of the record on appeal. Nitsche, however, did not dispute the amount paid for McDowell's funeral at the sentencing hearing. Accordingly, we find no abuse of discretion by the trial court in ordering that $2,880 be

paid for McDowell's funeral expenses — notwithstanding that the receipt was not admitted as an exhibit at the sentencing hearing.

**{¶80}** Nitsche also argues that the restitution order should be vacated because the only information before the trial court regarding his present or future ability to pay when it ordered restitution was the fact that he was indigent and had court-appointed counsel.

**{¶81}** R.C. 2929.19(B)(5) "'imposes a duty upon the trial court 'to consider the offender's present or future ability to pay' before imposing any financial sanctions under R.C. 2929.18.'" *State v. Aniton*, 8th Dist. Cuyahoga No. 102440, 2015-Ohio-4080, ¶ 19, quoting *State v. Tate*, 2d Dist. Montgomery No. 25386, 2013-Ohio-5167, ¶ 52. R.C. 2929.19(B)(5) states: "Before imposing a financial sanction under section 2929.18 of the Revised Code or a fine under section 2929.32 of the Revised Code, the court shall consider the offender's present and future ability to pay the amount of the sanction or fine." As this court previously explained, in fulfilling that duty:

> "The statute does not require that the trial court consider any specific factors when determining a defendant's present or future ability to pay financial sanctions. Nor does the statute require a hearing on the matter. The court is also 'not required to expressly state that it considered a defendant's ability to pay * * *.' 'The record should, however, contain "evidence that the trial court considered the offender's present and future ability to pay before imposing the sanction of restitution.'" * * * 'The court's consideration * * * may [also] be inferred from the record under appropriate circumstances.'"

*Aniton* at ¶ 19, quoting *Tate* at ¶ 52; *see also State v. Betliskey*, 8th Dist. Cuyahoga No. 101330, 2015-Ohio-1821, ¶ 42, 44 (describing what is required in considering ability to pay as a "low threshold"). "A trial court need not explicitly state in its judgment entry

that it considered a defendant's ability to pay a financial sanction.   Rather, courts look to the totality of the record to see if this requirement has been satisfied." *State v. Lewis*, 8th Dist. Cuyahoga No. 90413, 2008-Ohio-4101, ¶ 12.

{¶82} At sentencing, defense counsel stated that Nitsche had filed an affidavit of indigency, "is indigent as this point[,] * * * is unable to pay any fines or costs at this particular point in time and has been declared indigent by the Court of Common Pleas by virtue of [the] appointments [of counsel]."   No presentence investigation was conducted.  There is no information in the record regarding Nitsche's employment history, education, skills, assets or present or future income sources and the sentencing entry does not state that the trial court considered Nitsche's ability to pay restitution.   On the basis of defense counsel's statements, the trial judge stated: "I'm not imposing any fine. I'm waiving court costs based upon the indigency of the defendant. But I am ordering restitution to the victim's family for the funeral bill in the amount of $2,880." Considering the totality of the record in this case, although there is some indication — based on the trial court's reference to Nitsche's indigency — that the trial court considered Nitsche's present ability (or rather, inability) to pay restitution, there is nothing in the record that indicates whether the trial court considered Nitsche's future ability to pay restitution, as required under R.C. 2929.19(B)(5).   Given that Nitsche was sentenced to life in prison without the possibility of parole, we cannot infer that the trial court considered Nitsche's future ability to pay when it ordered restitution.   *See, e.g., State v. Russell,* 2d Dist. Montgomery No. 23454, 2010-Ohio-4765, ¶ 62-64 (appellate

court could not infer that the trial court considered defendant's future ability to pay restitution of more than $15,000 where defendant was sentenced to 40 and one-half years to life in prison and would be approximately 70 years old, at least, if he was ever released from prison); *State v. Napper*, 4th Dist. Ross No. 06CA2885, 2006-Ohio-6614, ¶ 15-17 (vacating restitution order where it was "unclear" how indigent defendant with no assets and a prison sentence of 51 years to life would have "the future ability to pay the victim's family"); *compare Aniton,* 2015-Ohio-4080, ¶ 21 (trial court complied with its obligation to consider defendant's ability to pay restitution order where it considered presentence investigation report and noted that defendant, who had been sentenced to 21 years in prison, would "hav[e] 21 years in prison to pay off those costs"). The trial court, therefore, abused its discretion in ordering restitution.

{¶83} Accordingly, we sustain Nitsche's second assignment of error, in part, and overrule it, in part. Since Nitsche did not dispute the amount of restitution ordered at sentencing, we reverse the restitution order and remand this matter to the trial court for consideration of Nitsche's present and future ability to pay the $2,880 in restitution previously ordered. *See, e.g., State v. Graves*, 8th Dist. Cuyahoga No. 99141, 2013-Ohio-2911, ¶ 13-15 (where there was no evidence that trial court considered defendant's present and future ability to pay prior to imposing $2,000 fine, trial court's imposition of fine and case remanded for a determination of defendant's present and future ability to pay fine); *see also Western*, 2015-Ohio-627, 29 N.E.3d 245, at ¶ 57, 59.

**Joinder of Counts Involving the Two Shootings**

**{¶84}** In his sixth and final assignment of error, Nitsche argues that the trial court erred in denying his motion to sever the claims related to the shooting of McDowell from those involving the shooting of Dean.

**{¶85}** Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Ohio law "'favors joining multiple offenses in a single trial'" if the requirements for joinder under Crim.R. 8(A) are met. *State v. Dean*, Slip Opinion No. 2015-Ohio-4347, ¶ 59, quoting *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990); *State v. Williams*, 73 Ohio St.3d 153, 157, 652 N.E.2d 721 (1995); *State v. Ferrell*, 8th Dist. Cuyahoga No. 100659, 2014-Ohio-4377, ¶ 38. Joinder is "liberally permitted" to preserve the public fisc, conserve judicial resources, reduce the opportunity for inconsistent results in successive trials and diminish inconvenience to witnesses. *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992); *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 10.

**{¶86}** If, however, it appears that a defendant is prejudiced by a joinder of offenses, the trial court may grant a severance under Crim.R. 14. Crim.R. 14 provides, in relevant part: "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * *, the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires." "Severance may be warranted if the trial court finds a serious

risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence." *State v. Jackson*, 8th Dist. Cuyahoga No. 102394, 2015-Ohio-4274, ¶ 12, citing *United States v. Zafiro*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). A defendant seeking severance must "'furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *State v. Hand*, 107 Ohio St.3d 166, 378, 2006-Ohio-18, 840 N.E.2d 151, quoting *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). The defendant "'bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance.'" *Dean* at ¶ 60, quoting *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29.

{¶87} If a defendant makes a case for prejudicial joinder, "[t]he state may rebut a defendant's claim * * * in two ways." *Dean* at ¶ 61; *Jackson* at ¶ 13. First, "if in separate trials the state could introduce evidence of the joined offenses as 'other acts' under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder" — the "other acts" test. *Dean* at ¶ 61, citing *Lott* at 163. Evid.R. 404(B) recognizes that evidence of other crimes may be admissible for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." If one offense could be introduced under Evid.R. 404(B) at the trial of the other offense, had the offenses been tried separately, "any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Schaim*, 65 Ohio St.3d at 59, 600

N.E.2d 661, quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C.Cir.1964). Second, ["the state can refute prejudice by showing that] 'evidence of each crime joined at trial is simple and direct'" — the "joinder test." *Dean* at ¶ 61, quoting *Lott* at 163. Where evidence of the joined offenses is "uncomplicated," such that the jury is "capable of segregating the proof" required to prove each offense, a defendant is not prejudiced by joinder. *State v. Lunder*, 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33 ("A trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated."); *State v. Ferren*, 8th Dist. Cuyahoga No. 95094, 2011-Ohio-3382, ¶ 40 ("A trial court does not abuse its discretion in denying a motion for severance of trials when the state presents evidence that is direct, uncomplicated, and the jury demonstrates its ability to segregate the proof on each charge.") "'The object of the simple and distinct test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other. The very essence of the rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it.'" *Echols*, 2015-Ohio-5138, at ¶ 16, quoting *State v. Echols*, 128 Ohio App.3d 677, 694, 716 N.E.2d 728 (1st Dist. 1998).

{¶88} Evidence of multiple offenses is "simple and direct" where, for example, the offenses involved different victims, different incidents or different factual scenarios and different witnesses. *See, e.g., State v. Dantzler*, 10th Dist. Franklin Nos. 14AP-907 and 14AP-908, 2015-Ohio-3641, ¶ 23; *State v. Morales*, 10th Dist. Franklin Nos. 03AP-318 and 03AP-319, 2004-Ohio-3391, ¶ 21; *see also Echols*, 2015-Ohio-5138, at ¶ 16 ("'Ohio

appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.'"), quoting *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33.

**{¶89}** If either the "other acts" test or the "simple and direct" test is met, a defendant cannot establish prejudice from the joinder. Thus, if the state can meet the "simple and direct" test, it need not meet the "stricter" "other acts" test. *Echols*, 2015-Ohio-5138, at ¶ 11 (a defendant is "not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B)").

**{¶90}** This court normally reviews a trial court's decision on joinder for an abuse of discretion. *State v. Banks*, 8th Dist. Cuyahoga Nos. 102360, 102361, 102362, and 102363, 2015-Ohio-5413, ¶ 64, citing *State v. Grimes*, 8th Dist. Cuyahoga No. 94827, 2011-Ohio-4406, ¶ 15. However, where a defendant fails to renew a Crim.R. 14 motion for severance either at the close of the state's case or the close of all evidence "'waives all but plain error on appeal.'" *Lyndhurst v. Smith*, 8th Dist. Cuyahoga No. 101019, 2015-Ohio-2512, ¶ 32, quoting *State v. Howard*, 3d Dist. Marion No. 9-10-50, 2011-Ohio-3524, ¶ 82; *see also State v. Ferren*, 8th Dist. Cuyahoga No. 95094, 2011-Ohio-3382, ¶ 34. The record before us does not indicate that Nitsche renewed his motion to sever at the close of the state's case or the close of all evidence. Accordingly, he has waived all but plain error.

**{¶91}** To demonstrate plain error, the defendant must show "an error, i.e., a deviation from a legal rule" that was "an 'obvious' defect in the trial proceedings," and that the error "affected a substantial right," i.e., a "reasonable probability" that the error resulted in prejudice, affecting the outcome of the trial. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). "We recognize plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Lyndhurst*, 2015-Ohio-2512, at ¶ 32, quoting *State v. Landrum*, 53 Ohio St.3d 107, 110, 559 N.E.2d 710 (1990).

**{¶92}** Nitsche does not dispute that joinder was proper under Crim.R. 8(A). However, he claims that he was prejudiced by the joinder of the offenses related to the two shootings and that the trial court should have, therefore, granted his motion for separate trials because the two incidents were "both violent in nature" and "[a] jury would, by nature, be more inclined to believe" his guilt of the offenses related to the second incident after hearing evidence of the shooting in the first incident and "vice versa." Nitsche's argument is meritless. In reviewing the evidence in this case, we find no prejudice to Nitsche as a result of the joinder of the offenses.

**{¶93}** The offenses relating to the shooting of Dean and the shooting of McDowell were charged together because they were of the "same or similar character" and part of "a common scheme or plan" or "course of criminal conduct" occurring over a relatively short period of time. Nitsche shot Dean because he believed (or rather Jackson

led him to believe) that Dean was the "other man" Jackson had been seeing while she was purportedly in an "exclusive" relationship with Nitsche. Within hours of Jackson's identification of Dean, Nitsche lured Dean to Jackson's apartment and, as soon as Dean appeared, Nitsche snuck up behind him and shot him at close range in the back with a single shot. When Nitsche learned that Dean was not, in fact, the man Jackson had been seeing and that the "other man" was actually McDowell, Nitsche then targeted McDowell. Within hours after Nitsche learned that McDowell had been seeing Jackson, Nitsche located McDowell, approached him and shot him at close range in the chest with a single shot.

{¶94} The trial court instructed the jury to consider each count separately:

The charges set forth in each count in the indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately, and you must state your findings as to each count uninfluenced by your verdict as to any other count. The defendant may be found guilty or not guilty of any one or all of the offenses charged.

{¶95} We presume that the jury followed the court's instructions. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 192, citing *State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994). There is nothing in the record to suggest that the jury confused the evidence as to the various counts or was improperly "influenced by the cumulative effect of the joinder." *Banks*, 2015-Ohio-5413, at ¶ 66.

To the contrary, the record demonstrates that the jury considered each offense separately, finding Nitsche not guilty of aggravated robbery in Count 10, while convicting him of the remaining offenses. *See, e.g., id.* at ¶ 66-68 (defendant was "unable to show that he was prejudiced by the trial court's refusal to sever his offenses" where he was acquitted of some charges and convicted of a lesser offense in others).

{¶96} Nitsche offers no evidence or information to support his claim that he was prejudiced by the jury's consideration of the offenses relating to McDowell's murder and the shooting and paralysis of Dean in a single trial. Nitsche's bald allegations are insufficient to establish prejudice. *See, e.g., State v. Rosas*, 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 48 (defendant did not meet his burden of establishing prejudice for purposes of motion to sever where defendant failed to provide "very much information to the trial court about how he was prejudiced" and nowhere explained how his rights were allegedly prejudiced but "merely assert[ed] broad general allegations of prejudice that any defendant could assert"); *see also State v. Corker*, 10th Dist. Franklin Nos. 13AP-264, 13AP-265, 13AP-266, 2013-Ohio-5446, ¶ 21, quoting *State v. Strobel*, 51 Ohio App.3d 31, 32, 554 N.E.2d 916 (3d Dist.1988) (rejecting defendant's "bare assertions" of prejudice and noting that "'there is always the possibility of prejudice in joining separate instances of any offense in the same indictment'" and that the defendant bears the burden to "'either affirmatively demonstrate before trial that his rights would be prejudiced by the joinder, or to show at the close of the state's case, or at the conclusion of all the evidence, that his rights actually had been prejudiced by the joinder'").

**{¶97}** Nitsche allegedly committed both shootings due to jealously relating to his girlfriend's relationships with other men, and there were a number of common elements between the two shootings. As such, evidence relating to both shootings would have likely been admissible at separate trials to prove Nitsche's motive or identity by modus operandi under Evid.R. 404(B). Furthermore, the evidence related to each shooting was "separate and direct." Nitsche shot two different victims, at different locations, on different dates. Different witnesses witnessed each of the shootings and separate police officers from separate police departments investigated the two shootings, i.e., CMHA police investigated the shooting of Dean and Cleveland police investigated the shooting of McDowell. Although Jackson provided testimony relevant to each of the shootings, she witnessed only one of the shootings. Likewise, although the same forensic experts testified regarding the testing of evidence relating to both shootings, the forensic evidence offered by the state was limited and was not so complicated as to result in confusion over which evidence related to which offense. Any claim of prejudice allegedly resulting from joinder of the offenses related to the two shootings was, therefore, rebutted by the state under the "other acts" or "joinder" tests.

**{¶98}** Further, claims of prejudice are less persuasive where, as here, the evidence is "'amply sufficient to sustain each verdict,'" regardless of whether the offenses were tried together. *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 73, quoting *State v. Torres*, 66 Ohio St.2d 340, 344, 421 N.E.2d 1288 (1981). The testimony of the eyewitnesses to the shootings — Jackson, Dean, Osborn

and Wylie — combined with Goodwin's testimony and the other evidence offered by the state provided strong evidence of Nitsche's guilt on each of the offenses at issue. The strength of the state's evidence "'establishes that the prosecution did not attempt to prove one case simply by questionable evidence of other offenses.'" *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶171-172, quoting *State v. Jamison*, 49 Ohio St.3d 182, 187, 552 N.E.2d 180 (1990).

**{¶99}** We find no error, plain or otherwise, in the trial court's denial of Nitsche's motion to sever. Accordingly, Nitsche's sixth assignment of error is overruled.

**{¶100}** As set forth above, we reverse the restitution order and remand this matter to the trial court for consideration of Nitsche's present and future ability to pay the $2,880 in restitution previously ordered. Nitsche's convictions and sentences are affirmed in all other respects.

**{¶101}** Judgment affirmed in part, reversed in part; remanded.

It is ordered that appellee and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to

Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

LARRY A. JONES, SR., A.J., and
ANITA LASTER MAYS, J., CONCUR