[Cite as *State v. Bates*, 2024-Ohio-2909.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 113438 |
| v. | : | |
| ANTONIO BATES, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 1, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-680718-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Samantha Sohl, Assistant Prosecuting Attorney, *for appellee.*

P. Andrew Baker, *for appellant.*

MARY EILEEN KILBANE, P.J.:

{¶ 1} Defendant-appellant Antonio Bates ("Bates") appeals from his convictions for rape, gross sexual imposition, and kidnapping following a jury trial. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} On May 8, 2023, a Cuyahoga County Grand Jury indicted Bates on one count of rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b), with a furthermore specification that the victim was under 10 years of age; one count of gross sexual imposition, a third-degree felony in violation of R.C. 2907.05(A)(4); and one count of kidnapping, a first-degree felony in violation of R.C. 2905.01(A)(4), with a furthermore specification that the victim was under 18 years of age. All three charges also carried sexually violent predator specifications, and the kidnapping charge also carried a sexual motivation specification. These charges arose from an alleged incident between Bates and his girlfriend's six-year-old niece.

{¶ 3} On August 28, 2023, the State filed a notice of intent to introduce other acts evidence related to Bates's 2014 conviction for gross sexual imposition.

{¶ 4} At a pretrial hearing on October 25, 2023, defense counsel addressed the court regarding Bates's 2014 conviction for gross sexual imposition. The following exchange occurred:

> THE COURT: Okay. So there was some discussion, [defense counsel], about you have a limited objection of some sort to the 404(B). Do you want to explain that?
>
> DEFENSE COUNSEL: Yes, your Honor.
>
> THE COURT: Okay.
>
> DEFENSE COUNSEL: We believe that there's going to be some questioning on the defense's part as to whether or not some of the State's witnesses knew of my client's prior offense. Our objection is that they not be allowed to go into the details of that offense but – simply because it was a prior sexual offense.

THE COURT: That's kind of like cracking open the door.

DEFENSE COUNSEL: I know.

THE COURT: — instead of like you can't — so you just said, "I know."

DEFENSE COUNSEL: But I think the actual details of his prior offense — I know, I know. That's why I said this is a peculiar situation.

THE COURT: So I think what I'm going to do then — because typically that's not the case usually I'm just — yeah, we're all laughing — so usually I just have to determine whether or not the 404(B) comes in or out. But what you're alerting me to, and I appreciate it ahead of time, is that — let's just say, for hypothetical reasons, I kept it out.

DEFENSE COUNSEL: Right.

THE COURT: You'll alert me to the fact that you might be opening up the door.

DEFENSE COUNSEL: That I might open it exactly.

THE COURT: And when you say so — I've never been in this situation.

DEFENSE COUNSEL: Okay, let me clarify that.

THE COURT: I've never been in a situation where somebody wanted to bring in a prior sex offense for defense purposes.

DEFENSE COUNSEL: Okay. And let me be a little more clear.

THE COURT: Okay.

DEFENSE COUNSEL: I probably will be asking some of the witnesses if they were aware that my client had been previously convicted of a sexually-oriented offense.

THE COURT: Okay.

DEFENSE COUNSEL: And I'd like it – I know – but I know I'm opening the door.

THE COURT: Okay, so let me ask you a few questions. Is there some sort of allegation that the family members of the previous victim and this – the family members here knew each other?

DEFENSE COUNSEL:  No.

ASSISTANT PROSECUTING ATTORNEY:  No.

THE COURT:  Okay.  Is it for a bias-type issue or — I mean I'm — I'm trying to get at the purpose of why it's relevant that the family members would know I guess — the family members of this victim would know. I mean — and I don't mean to ask you to disclose your trial strategy but I guess I'm just trying to understand the purpose so I can better formulate what I'm supposed to do here.  I see you're kind of like yeah.

DEFENSE COUNSEL:  Yeah.  I mean it's really no big secret.

ASSISTANT PROSECUTING ATTORNEY:  Yeah.

DEFENSE COUNSEL:  She knows.

ASSISTANT PROSECUTING ATTORNEY:  It's in discovery anyways.

DEFENSE COUNSEL:  She knows what I'm going to say.

THE COURT:  Do you intend to have a jury trial —

DEFENSE COUNSEL:  I do.

THE COURT:  — or are you hesitant because you don't want me —

DEFENSE COUNSEL:  Yeah — no, we're going to have jury trial for sure.

THE COURT:  All right.

DEFENSE COUNSEL:  And part of the issue here is whether or not there was knowledge of a prior offense for my client and therefore there was some coercion.  In other words, "he's been convicted before, if you say he did this again they will believe you because of the prior conviction."

THE COURT:  Interesting.  Okay, were you planning on bifurcating at all?  I mean because now —

DEFENSE COUNSEL:  Yes, but it's still going to come in.  I want to bifurcate the sexually violent predator spec, but I did file an objection because if you keep it out I'm probably going to open the door.

THE COURT: Okay. Is there a possibility that you might want to come up with a limited stipulation?

ASSISTANT PROSECUTING ATTORNEY: That's something we kind of —

DEFENSE COUNSEL: We kind of talked about it.

ASSISTANT PROSECUTING ATTORNEY: We could explore it absolutely.

THE COURT: Because we don't have to make the whole trial about this other incident because I don't think that's particularly your intention. I think it's to show for the purposes of 404(B). That's why you file the 404(B), and it appears that this is sort of somehow your defense and so there might be somewhere where I don't even have to make a decision and you guys can come to a stipulation.

ASSISTANT PROSECUTING ATTORNEY: We can work on that, Judge, absolutely.

THE COURT: So it could be, you know, limited to the fact that he was convicted, the child's age, the — I mean you guys decide how much. And if one wants more or less I can maybe call some balls or strikes but see if you can come to an agreement on that. And that would — you know, you guys try your own case. Okay, that's interesting.

{¶ 5} Immediately prior to trial, the parties continued this discussion with the court and agreed on a stipulation that Bates was a convicted sex offender, and that the victim in that case was a young girl.

{¶ 6} Bates waived his right to a jury trial as to the sexually violent predator specifications, and the case proceeded to a jury trial on the other charges on November 1, 2023. After both the assistant prosecuting attorney and defense counsel made their opening statements, the court gave the following stipulation to the jury:

There is an agreement of fact that both parties are giving to you, you can take it as conclusively proven, and you do not need any other testimony, witness, or otherwise to prove it because they are agreeing that it's conclusively proven.

The stipulation is as follows: "The defendant, Antonio Bates, is a registered sex offender. The defendant was convicted in 2014 of a sex offense, and the victim in that case was a young girl."

{¶ 7} K.B., the mother of A.R., the victim in this case, testified that she lives in Cleveland, Ohio with her four children, including A.R. K.B. testified that she has two sisters, A.E. and T.C., who was also known as Lady. T.C. was in a romantic relationship with Bates, who was also known by the nickname "Face." K.B. testified that around January 2022, she had a decent relationship with her sister T.C., and K.B. and her children often spent time at T.C.'s house. Specifically, K.B. testified that she often dropped off A.R. and A.R.'s brother, B.T., at T.C.'s house. K.B. also testified that at the end of August 2022, her car was vandalized, so she relied on T.C. to pick up her children and take them to school. K.B. testified that sometimes T.C. would drop the children off at home in the afternoons, but other times, it was more convenient for them to spend the night at T.C.'s house.

{¶ 8} K.B. testified that this arrangement lasted for about six weeks, until her mother, G.B., informed her that Bates was a sex offender.

{¶ 9} K.B. testified that on the morning of March 27, 2023, while getting her children ready to go to school, her son B.T. stated that he would like to go to "Auntie Lady's" house, to which A.R. responded that she did not want to go. When K.B. asked A.R. why she did not want to go to T.C.'s house, A.R. responded "because Face does weird things to me." The children then left for school. Based on this

conversation, K.B. picked her children up from school shortly thereafter and went to the police station with her mother, G.B., and A.R., to make a report based on A.R.'s disclosure. K.B. testified that she and A.R. were subsequently interviewed by a caseworker with the Cuyahoga County Division of Children and Family Services ("CCDCFS"), as well as by a police detective.

{¶ 10} K.B. testified that while she has a good relationship with A.E. and their mother, G.B., at the time of trial, she had not spoken to her sister T.C. in months.

{¶ 11} A.R. testified at trial and identified Bates as the person she knew as "Face." When asked to describe what Face did to her, A.R. testified that when she was at her aunt's house, Face taught her a game in which he told her to guess the candy that he put on her tongue and covered her eyes with a face mask. During this game, Face put candy on her tongue and then put "his area" on her tongue. A.R. testified that she knew that he put "his area" on her tongue because she was peeking out of the bottom of the mask. When asked what Face's "area" was, A.R. testified that she did not know what to call it, but she had the same area, and her area was called a vagina. When presented with a picture of a male body, A.R. was able to identify the man's genitalia as the "area."

{¶ 12} A.R. testified that she was in her aunt's living room when this occurred, and that B.T., her aunt T.C., and T.C.'s daughter were also in the house at the time. A.R. testified that B.T. was in T.C.'s bedroom, her cousin was in her own

bedroom, and T.C. was in the meditation room, which was located directly off the living room.

{¶ 13} A.R. testified that during the incident, she was fully dressed, Bates's pants were halfway down, and she was scared. When asked how the incident ended, A.R. testified that Bates gave A.R. his phone, took her into T.C.'s bedroom, and told her to lay down and go to sleep. A.R. testified that her brother was still in T.C.'s bedroom playing video games, and she laid down on the bed sideways and Bates put his "private part" on her side. A.R. testified that she and Bates were both under a blanket while this happened.

{¶ 14} A.R. testified that she asked Bates if she could go to the bathroom because she wanted to get away from him, and she does not remember what happened after she went to the bathroom. She testified that she did not tell her mother what had happened right away because she was scared. A.R. testified that she eventually told her mother what Bates had done because B.T. kept saying that he wanted to go back to T.C.'s house, but she did not. A.R. testified that she went to school after she told her mother what happened, but she was only there for a short time before her mother and grandmother picked her up and the three of them went to the police station.

{¶ 15} A.R.'s brother, B.T., who was 11 years old at the time of trial, testified he and A.R. and some of their cousins would often go over to T.C.'s house. B.T. testified that T.C. and Bates were both at the house, and B.T. testified that he liked Bates and they would play video games together.

{¶ 16} A.E. testified that she was T.C. and K.B.'s sister. A.E. testified that at the time of trial, she did not have a relationship with their mother, G.B., and that a civil protection order had been in place against G.B. for several months prior to trial. A.E. testified that she had a close relationship with her sister T.C., and a less close relationship with K.B. due to K.B.'s close relationship with their mother.

{¶ 17} A.E. testified in August and September 2022, while she was pregnant with her younger son, T.C. would often watch her older son. During this time, Bates would sometimes also be at T.C.'s house. According to A.E., B.T. and A.R. were also periodically at T.C.'s house during this time.

{¶ 18} A.E. testified that her mother, G.B., was aggressive towards A.E.'s children and threatened to call child protective service on A.E. because she was an unfit mother; A.E. denied these allegations and described G.B. as a "master manipulator."

{¶ 19} A.E. testified that sometime before August 2022, T.C. told her that Bates was a registered sex offender. According to A.E., T.C. felt like she needed to share this information with the family because G.B. used the information as a form of manipulation.

{¶ 20} Re'gine Wells ("Wells"), testified that she was a caseworker with CCDCFS. Wells testified that for the past few months leading up to trial, she was a sex abuse caseworker, and prior to that, she was a short-term investigative worker in the sex abuse unit of CCDCFS.

{¶ 21} Wells testified that in April 2023, she was assigned to work on a case involving A.R., the victim in the instant case. Wells then reached out to A.R.'s mother, K.B., and scheduled a home visit with the family. Wells then scheduled a forensic interview with A.R., which subsequently took place at a child advocacy center. The State played the video recording of Wells's forensic interview with A.R. at trial during Wells's testimony. Wells testified that A.R. disclosed that she was blindfolded at her Aunt Lady's house and that the alleged perpetrator put a body part on A.R.'s tongue, and then took her into her aunt's bedroom where he put that same body part on her body while she was fully clothed. According to Wells, A.R. did not have a name for the perpetrator's body part, but described it as being like her vagina, but she didn't know the name for it.

{¶ 22} Following A.R.'s disclosure, Wells contacted A.R.'s aunt, T.C. Wells visited T.C.'s house in Cleveland, Ohio and identified the different rooms in the house. Wells ultimately followed up with the family and referred them to the Cleveland Rape Crisis Center for services. Finally, Wells testified the disposition in this case was "substantiated," meaning that there was a disclosure or admittance of child abuse and neglect and corroborating evidence for that disclosure. With respect to the corroborating evidence, Wells testified that she was able to clearly identify the rooms that A.R. had described in T.C.'s house — a meditation room and a bedroom — and she was able to confirm that a man — Bates — with a criminal history of sexually abusing a child had access to A.R. in the home on multiple occasions, and that Bates had admitted to being present in the home with A.R.

{¶ 23} Detective Darryl Turner ("Detective Turner") testified that he was employed in the sex crimes and child abuse unit of the Cleveland Division of Police. Detective Turner testified that he was assigned to this case following K.B.'s report based on A.R.'s disclosure in March 2023.

{¶ 24} Detective Turner testified that the forensic interview was scheduled, and because A.R.'s disclosure was made months after the alleged incident, his investigation did not begin until after the forensic interview took place. Detective Turner testified that after Wells conducted A.R.'s forensic interview, he interviewed K.B. Based on these interviews, the only name they had for the suspect was "Antonio," and K.B. provided Detective Turner with a photograph of Bates. Detective Turner then ran the photograph through a law enforcement database and came back with a possible suspect of Antonio Bates. Subsequently, a blind photo lineup was administered to K.B., and K.B. identified Bates.

{¶ 25} Ultimately, on April 27, 2023, Detective Turner and another detective arrested Bates. The same day, Detective Turner interviewed Bates. His investigation also included interviewing T.C. and G.B. and visiting T.C.'s house to take photographs; the State submitted these photographs as evidence at trial.

{¶ 26} At the close of the State's case, Bates's counsel made a Crim.R. 29 motion for acquittal. The court denied this motion.

{¶ 27} During the parties' discussions on jury instructions with the court, the following exchange took place:

THE COURT: I don't want to open Pandora's box, but you guys had a unique quasi 404(B)/not 404(B) agreement to inform the jury of his prior conviction for a sex offense.

Typically, any time that does come in, there is an instruction to the jury about how and why they can consider that.

I'll just ask because I've never — you guys made this agreement unto yourselves and I never ended up having to rule on the 404(B) motion because you guys came to an agreement.

Do you want any instruction? And we can create our own because you guys have been doing this pretty uniquely so far. Anything that either party would like for the jury to know, how to view that, because it's — I never had this situation before where both the State and the defense agreed to allow the jury to know about the prior conviction that he is a registered sex offender.

ASSISTANT PROSECUTING ATTORNEY: Your Honor, I'd ask for no special instruction. I think it would call attention to it. The State, obviously, did not use it as 404(B) evidence. It was the defense trial strategy as the defense, and I think that's been abundantly clear. So I would request that no additional instruction be given.

DEFENSE COUNSEL: I agree, Your Honor.

THE COURT: The only reason I ask is because, when you did bring it up and you brought it up in voir dire, there was an instruction — not an instruction, but actually you did mention to them, you know, that you can't just — because somebody did something before, doesn't mean that they've done it this time, and that's kind of the instruction about how you can use these prior convictions or how you can't use them.

So if there is going to be any discussion about how the jury can view it, I prefer that instruction to come as an instruction of law.

DEFENSE COUNSEL: I think we agree on no further instruction.

{¶ 28} Defense counsel rested and renewed the Crim.R. 29 motion. The court again denied this motion. The court instructed the jury, and the parties

presented their closing arguments. During the State's rebuttal closing argument, the assistant prosecuting attorney made the following statements:

> I'm going to borrow a term that [defense counsel] used in her voir dire, actually: Smoke and mirrors. That's what you just spent the last however long it was listening to [defense counsel.] Smoke and mirrors. Look over here. No, look over here. Look over here, instead of looking right here, instead of looking at the evidence.

{¶ 29} After deliberating for half a day, the jury sent a note to the trial court reading, "The jury is not unanimous in its decision. We do not see that changing." The trial court issued the standard jury instruction relating to deadlocked deliberations, commonly known as the *Howard* charge, to the jury and released the jury for the day. *State v. Howard*, 42 Ohio St.3d 18 (1989). The next day, November 9, 2023, the jury deliberated and returned a verdict of guilty on all counts and specifications that were tried to it.

{¶ 30} On November 30, 2024, the sexually violent predator specifications were tried to the bench. The State called Michael Bokmiller ("Bokmiller"), who testified that he was currently employed as the director of community partnerships at Canopy Child Advocacy Center. Bokmiller was previously employed as a supervisor and caseworker in the sex abuse unit of CCDCFS. Bokmiller testified that in October 2012, he became involved in an investigation where Bates was the alleged perpetrator of sexual offenses against a young girl, M.B.; Bokmiller testified that he believed that M.B. was a relative of Bates. As part of that investigation, Bokmiller conducted a forensic interview of M.B., who was four years old at the time. Bokmiller testified that during this interview, M.B. disclosed that Bates put his hand

in her underwear. After this interview and a subsequent interview with M.B.'s mother, Bokmiller's final disposition for his investigation was that sexual assault had been indicated.

{¶ 31} The State also introduced certified records documenting Bates's prior conviction for gross sexual imposition, as well as a subsequent conviction for failing to notify of a change of address as a Tier I sexual offender.

{¶ 32} The court found Bates guilty on the sexually violent predator specifications.

{¶ 33} The trial court sentenced Bates to life without the possibility of parole for rape; five years to life for gross sexual imposition; and 15 years to life for kidnapping. The trial court also classified Bates as a tier III sexual offender.

{¶ 34} Bates filed a timely notice of appeal and presents six assignments of error for our review:

> I. Defendant-appellant's convictions must be reversed as he did not receive effective assistance of counsel.
>
> II. Defendant-appellant's convictions must be reversed as they are against the manifest weight of the evidence.
>
> III. The trial court committed plain error by failing to merge the kidnapping and gross sexual imposition convictions.
>
> IV. The trial court's finding that defendant-appellant was a sexually-violent predator was against the manifest weight of the evidence.
>
> V. The conviction for gross sexual imposition must be vacated.
>
> V. The kidnapping charge was not supported by sufficient evidence.

**Law and Analysis**

**I. Effective Assistance of Counsel**

{¶ 35} In his first assignment of error, Bates argues that his convictions must be reversed because he received ineffective assistance of counsel. Specifically, Bates argues that his counsel was ineffective for stipulating to the admission of evidence of Bates's prior sex offense and for failing to object to improper closing arguments from the assistant prosecuting attorney.

{¶ 36} Ohio Const. art. 1, § 10 and U.S. Const. amend. VI provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has recognized that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 688 (1984).

{¶ 37} To establish ineffective assistance of counsel, Bates must demonstrate that (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced him so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland* at 687. The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 2000-Ohio-448, 389. Further, there is a presumption that a licensed attorney is competent, and to justify a finding of ineffective assistance of counsel, Bates must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *State v. Howell*, 2019-Ohio-3182, ¶ 21 (8th Dist.), citing *State v. Calhoun*, 1999-Ohio-102, 289 and

*Strickland* at 689. "Tactical or strategic trial decisions, even if ultimately unsuccessful, generally do not constitute ineffective assistance of counsel." *Id.*, citing *State v. Carter*, 1995-Ohio-104, 558.

{¶ 38} Bates's first argument centers on the stipulation made at the outset of trial, pursuant to which Bates and the State of Ohio agreed to stipulate that Bates was a convicted sex offender, and that the victim of that offense was a young girl. Following the stipulation, the fact of Bates's prior conviction came up multiple times throughout the trial. Specifically, K.B. testified that the reason that she stopped taking A.R. and B.T. to her sister's house was that she learned of Bates's history. A.E. also referenced Bates's conviction, testifying that her mother used this information to manipulate other family members.

{¶ 39} Bates now argues that his trial counsel's decision to introduce "such devastating evidence" of Bates's past, coupled with trial counsel's doing "very little to follow up at trial and provide it as a viable defense strategy" amounts to deficient performance. Bates argues that it is unclear why his trial counsel would have done anything other than tenaciously oppose any attempt by the State of Ohio to introduce evidence of his prior conviction, given that the damage he faced in a jury trial for sex offenses is obvious.

{¶ 40} In order to adequately address Bates's arguments here, we must first expand on Bates's trial counsel's strategy as it relates to the stipulation. Our review of the record shows that trial counsel sought to illustrate that A.R.'s allegations were fabricated — not necessarily by A.R. herself, but by her mother and grandmother —

as part of a complex family dynamic. Specifically, trial counsel's theory of the case was that A.R.'s grandmother, G.B., attempted to use her knowledge of Bates's prior conviction to fabricate a new allegation to use as leverage in a separate conflict she had with T.C.

{¶ 41} Bates argues that, having voluntarily opened the door to the evidence of Bates's prior conviction, his trial counsel failed to sufficiently follow up on this theory at trial. Therefore, according to Bates, even if this could have been considered a viable defense strategy, it was not effectively used as such.

{¶ 42} "'Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel.'" *State v. Gilmore*, 2016-Ohio-4697, ¶ 6 (8th Dist.), quoting *State v. Carter*, 1995-Ohio-104. Thus, we do not consider the relative merits of trial counsel's strategy or theory of the case. Instead, we are concerned here with whether, as Bates argues, his trial counsel failed to adequately follow through with this strategy.

{¶ 43} Generally, "'[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel.'" *State v. Mendez*, 2020-Ohio-3031, ¶ 39, quoting *State v. Conway*, 2006-Ohio-2815, ¶ 101. Here, our review of the record reveals that trial counsel consistently attempted to execute this trial strategy. Trial counsel's cross-examination of the family members included inquiries about the nature of the familial relationships in this case. Specifically, trial counsel inquired about a falling

out between G.B. and T.C. over money; about an antagonistic voicemail that G.B. had left T.C.; about how long various family members had known about Bates's prior conviction, particularly in relation to when K.B. allowed A.R. to spend time in T.C.'s home when Bates was there; and about G.B.'s reputation for manipulation. Moreover, trial counsel's closing argument asserted that various aspects of A.R.'s testimony supported Bates's position that A.R.'s allegations were fabricated.

{¶ 44} In support of his argument, Bates relies on a First District case in which the court found that counsel was deficient for the "gratuitous revelation of [the defendant's] prior sex offense with a child." *State v. Goldson*, 138 Ohio App.3d 848, 851 (1st Dist. 2000). In *Goldson*, counsel described Goldson in his opening statement as "no angel" who "has been in trouble with the law before" because "[h]e was on a prior occasion convicted after pleading guilty to gross sexual imposition. Improper contact, sexual contact." *Id*. at 850. Additionally, when questioning Goldson's girlfriend — the mother of the victim in that case — counsel inquired about Goldson's prior conviction and elicited testimony that difficulties in the witness's relationship with Goldson were prompted by his guilty plea in the prior case.

{¶ 45} *Goldson* is distinguishable from the instant case. First, unlike in *Goldson*, where the State did not attempt to introduce evidence of Goldson's prior conviction, the State in the instant case filed a notice of intent to use other acts evidence. Moreover, counsel in *Goldson* both opined on his client's criminal history and elicited testimony about details surrounding that prior conviction. Here, Bates's

counsel agreed to a limited stipulation regarding his prior conviction, and while the prior conviction was a critical aspect of trial counsel's strategy, the strategy did not involve eliciting additional testimony about the prior conviction beyond witnesses' knowledge thereof.

{¶ 46} With respect to the assistant prosecuting attorney's closing arguments, Bates argues that his counsel was ineffective for failing to object to repeated statements that defense counsel's closing argument was merely "smoke and mirrors."

{¶ 47} Generally, "'the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel.'" *State v. Cepec*, 2016-Ohio-8076, ¶ 117, quoting *State v. Conway*, 2006-Ohio-2815, ¶ 103. Further, parties are granted great latitude in closing arguments. *State v. Morton*, 2021-Ohio-581, ¶ 15 (8th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239, 269 (1984). While statements like those at issue here have been deemed improper, we cannot conclude that Bates's counsel's failure to object to the statements in this case amounted to ineffective assistance of counsel.

{¶ 48} The Ohio Supreme Court reversed a conviction where the prosecutor referred to defense evidence as "lies," "garbage," "garbage lies," "[a] smoke screen," and "a well conceived and well rehearsed lie." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). The court in *Smith* also found, critically, that it was "clear that this misconduct prejudicially affected substantial rights of the defendant." *Id*. at 15. Here, we cannot conclude that several uses of the phrase "smoke and mirrors"

amounts to the flagrant misconduct the Ohio Supreme Court reviewed in *Smith*. First, the statements were made in response to Bates's counsel's closing argument, in which counsel focused on the theory that strained family relationships resulted in fabricated allegations of sexual assault rather than on A.R.'s actual disclosure and testimony. While the State could have pointed out that defense counsel was perhaps attempting to divert the jury's attention away from critical issues in the case more directly, without resorting to the phrase "smoke and mirrors," usage of this phrase alone does not necessary prejudice a defendant. *State v. Hooper*, 2001 Ohio App. LEXIS 2461, *10 (2d Dist. June 1, 2001). Here, Bates has not shown that these comments were so improper that they prejudiced him; nor has he shown a reasonable probability that, had his counsel objected, the outcome of his trial would have been different.

{¶ 49} For these reasons, we cannot conclude that Bates received ineffective assistance of counsel. Therefore, Bates's first assignment of error is overruled.

## II. Manifest Weight of the Evidence

{¶ 50} In his second assignment of error, Bates argues that his convictions are against the manifest weight of the evidence. Specifically, he argues that there was no physical evidence linking him to offenses and the only witness who had personal knowledge of the offenses was A.R. Bates further points to inconsistencies between K.B. and G.B. surrounding the events on the date of A.R.'s disclosure and inconsistencies between A.R. and other witnesses as to whether the alleged abuse occurred on more than one day.

{¶ 51} A manifest weight challenge questions whether the State met its burden of persuasion. *State v. Bowden*, 2009-Ohio-3598 (8th Dist.). "'[W]eight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 2021-Ohio-856, ¶ 32 (8th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). On a manifest weight challenge, "a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus.

{¶ 52} The State may use either direct or circumstantial evidence to prove the essential elements of an offense. *State v. Lundy*, 2008-Ohio-3359, ¶ 12 (8th Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991). The mere fact that the State did not present physical evidence showing that Bates committed rape, gross sexual imposition, or kidnapping does not mean that the record contains insufficient evidence or that his convictions are against the manifest weight of the evidence. *Id.*, citing *State v. Owens*, 2001 Ohio App. LEXIS 173 (9th Dist. Jan. 24, 2001) (stating that the absence of corroborating physical evidence does not negate the testimony of a witness to a crime); *State v. West*, 2006-Ohio-1875 (10th Dist.) (stating that officers' direct testimony as to defendant's actions sufficiently established offense

committed, despite lack of physical evidence); *State v. Nix*, 2004-Ohio-5502 (1st Dist.) (holding that State need not produce physical evidence to prove its case if direct testimony establishes elements of the crime.) Physical evidence merely would have bolstered A.R.'s direct testimony. *Id.*, citing *State v. Reine*, 2007-Ohio-7221 (4th Dist.). We note that it is particularly unlikely for the absence of physical evidence to render a conviction against the manifest weight of the evidence where, as here, the indictment was the result of a delayed disclosure in a child sexual assault case. The fact that such cases may inherently lack certain kinds of physical evidence does not mean that the convictions therein are against the manifest weight of the evidence.

{¶ 53} Further, a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory. *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 40 (8th Dist.), citing *State v. Nitsche*, 2016-Ohio-3170, ¶ 45 (8th Dist.), and *State v. Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.). "'"While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, . . . such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence."'" *Id.*, quoting *State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.), quoting *State v. Nivens*, 1996 Ohio App. LEXIS 2245, *7 (10th Dist. May 28, 1996).

{¶ 54} Bates argues that his convictions are against the manifest weight of the evidence because K.B. testified that Bates had inappropriately touched A.R. on multiple occasions, while A.R. only testified to two separate instances occurring on

the same day. Bates also points to the inconsistencies between K.B.'s and G.B.'s respective versions of events on the date that A.R. made her disclosure; K.B. and G.B. disagreed as to who picked A.R. up from school on the date of the disclosure.

{¶ 55} These inconsistencies are not so significant as to render Bates's convictions against the manifest weight of the evidence. The evidence presented, including testimony from A.R., was generally consistent as to the essential elements of the offenses in this case. Therefore, we cannot conclude that the jury somehow lost its way. Bates's second assignment of error is overruled.

### III. Merger

{¶ 56} In his third assignment of error, Bates argues that the trial court committed plain error by failing to merge the kidnapping and gross sexual imposition convictions for sentencing.

{¶ 57} Generally, we review de novo whether certain offenses should be merged as allied offenses under R.C. 2941.25. *State v. Bailey*, 2022-Ohio-4407, ¶ 6, citing *State v. Williams*, 2012-Ohio-5699, ¶ 1. However, because Bates failed to preserve the issue of merger at trial by objecting, we review the issue for plain error. *Id*. at ¶ 7, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 28 ("the failure to raise the allied offense issue at the time of sentencing forfeits all but plain error").

{¶ 58} Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice. *Id*., citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus ("Notice of plain error. . . is to be taken with the utmost caution, under exceptional

circumstances and only to prevent a miscarriage of justice"). To prevail under plain error, Bates must establish that "'an error occurred, that the error was obvious, and that there is "a reasonable *probability* that the error resulted in prejudice," meaning that the error affected the outcome of the trial.'" *Id.* at ¶ 8, quoting *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *Rogers* at ¶ 22 (emphasis added in *Rogers*).

{¶ 59} R.C. 2941.25(A) prohibits multiple convictions for allied offenses of similar import. Courts apply a three-part test under R.C. 2941.25 to determine whether a defendant can be convicted of multiple offenses:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? And (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Bailey* at ¶ 10, quoting *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 2015-Ohio-995, ¶ 31.

{¶ 60} Bates argues that the trial court committed plain error in failing to merge his gross sexual imposition and kidnapping convictions. The evidence the State presented at trial was that the rape offense took place in the living room of T.C.'s house when Bates put his penis in A.R.'s mouth, and subsequently, Bates removed A.R. from the living room to T.C.'s bedroom, where the gross sexual imposition occurred when Bates put his penis on A.R.'s side while she lay on a bed.

{¶ 61} Bates asserts that because the kidnapping here was merely incidental to the gross sexual imposition, the offenses were not committed with separate animus or motivation. We disagree. Bates did not merely remove A.R. from the living room to the bedroom to facilitate the gross sexual imposition offense. Rather, Bates gave A.R. his phone and ordered her to go to the bedroom and lay down and go to sleep. It was at this point that Bates committed the gross sexual imposition offense by placing his penis on A.R.'s side. Therefore, the record reflects that the offenses were committed separately, and it was not plain error for the trial court to permit separate convictions for kidnapping and gross sexual imposition. Bates's third assignment of error is therefore overruled.

## IV. Sexually Violent Predator Specification

{¶ 62} In Bates's fourth assignment of error, he argues that the trial court's finding that he was a sexually violent predator was against the manifest weight of the evidence. Bates's argument is premised on the notion that his convictions in the instant case should not count towards a court's consideration of whether a defendant has been convicted of a sexually oriented offense "two or more times" pursuant to R.C. 2907.01(H)(2).

{¶ 63} We reiterate that on a manifest weight challenge, "'a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?'" *State v. Ferguson*, 2024-Ohio-576, ¶ 28 (8th Dist.), quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 25. Further, reversal of a trial court's "'judgment on manifest weight of the evidence requires the unanimous concurrence of all three appellate judges.'" *Id.*,

quoting *State v. Crumbley*, 2010-Ohio-3866, ¶ 20 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, paragraph four of the syllabus.

{¶ 64} R.C. 2971.01(H) defines a "sexually violent predator" as an offender who "commits a sexually violent offense and who is likely to engage in the future in one or more sexually violent offenses." In analyzing the likelihood that a person will engage in one or more sexually violent offenses in the future, courts may consider any of the following six factors:

> (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.

> (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.

> (c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

> (d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

> (e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.

> (f) Any other relevant evidence.

{¶ 65} In support of his argument here, Bates urges this court to reconsider our interpretation of R.C. 2971.01 in favor of the reasoning in *State v. Smith*, 2004-Ohio-6238. In *Smith*, the Ohio Supreme Court held that R.C. 2971.01(H)(1) requires that only a conviction that existed prior to the indictment of the underlying offenses

can be used to support a sexually violent predator specification. Subsequently, *Smith* was superseded by statute based on a clarification to R.C. 2971.01. *State v. Townsend*, 2020-Ohio-5586, ¶ 8. Further, this court has consistently held that the law does not require that all of the factors in R.C. 2971.01(H)(2) be proven in order to classify a defendant as a sexually violent predator. *State v. Woods*, 2024-Ohio-954, ¶ 53 (8th Dist.), citing *State v. Sopko*, 2009-Ohio-140, ¶ 48 (8th Dist.) and *State v. Williams*, 2001 Ohio App. LEXIS 4188 (8th Dist. Sept. 20, 2001). Instead, any of the factors may be considered as evidence that an individual is likely to engage in one or more sexually violent offenses. *Id.* Specifically, this court has held that courts may consider convictions in the case at hand when analyzing whether a defendant has been convicted two or more times of a sexually oriented offense pursuant to R.C. 2971.01(H)(2)(a). *State v. Hartman*, 2018-Ohio-2641, ¶ 24 (8th Dist.). We decline to ignore the legislature and case law and adopt an outdated interpretation of R.C. 2971.01(H).

{¶ 66} The sexually violent predator specification was not against the manifest weight of the evidence where the court heard evidence regarding Bates's prior conviction for a sexual offense committed against a young relative. The court did not lose its way and create a manifest miscarriage of justice in finding Bates guilty of sexually violent predator specifications. Therefore, Bates's fourth assignment of error is overruled.

## V. Sufficiency of the Evidence

{¶ 67} In Bates's fifth assignment of error, he argues that his conviction for gross sexual imposition was not supported by sufficient evidence. In his sixth and final assignment of error, he argues that his conviction for kidnapping was not supported by sufficient evidence. Because both assignments of error deal with the legal sufficiency of the evidence, we will address them together.

{¶ 68} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is "to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Noah*, 2022-Ohio-1315, ¶ 7 (8th Dist.), citing *State v. Murphy*, 2001-Ohio-112, 543. "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Walker*, 2016-Ohio-829, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Essentially, the test for sufficiency requires determining whether the prosecution met its burden of production at trial. *Id.*, citing *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.).

{¶ 69} With respect to his argument that his conviction for gross sexual imposition was not supported by sufficient evidence, Bates argues that although he was charged with touching A.R.'s "thigh" or "pubic region," the evidence only showed that Bates touched A.R.'s hip.

**{¶ 70}** Bates was convicted of gross sexual imposition under R.C. 2907.05(A)(4), which provides:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more persons to have sexual contact when. . .the other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

"Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying the other person." R.C. 2907.01(B).

**{¶ 71}** Bates argues that because there was no testimony that he specifically touched A.R.'s thigh or pubic region, there was insufficient evidence to support his gross sexual imposition conviction. He relies on *State v. Robinson*, in which this court found insufficient evidence where Robinson was charged with sexual contact with the victim's "bottom" and the victim repeatedly and adamantly testified that Robinson did not touch her bottom. *State v. Robinson*, 2024-Ohio-455 (8th Dist.). Unlike *Robinson*, Bates was charged with sexual contact to A.R.'s thigh or pubic region, and the victim in this case testified that Bates put his penis on her hip while she was laying on her side in bed. A.R. did not explicitly deny that Bates had contact with her thigh or pubic region. Indeed, much of A.R.'s testimony about her own and Bates's body parts included general terms such as "area." Viewing the evidence in a

light most favorable to the State, A.R.'s testimony was sufficient to show that Bates had sexual contact with A.R.

{¶ 72} With respect to his kidnapping conviction, Bates argues that there was insufficient evidence to support the kidnapping charge where there was no evidence that Bates physically led or carried A.R. into the bedroom.

{¶ 73} Bates was convicted of kidnapping in violation of R.C. 2905.01(A)(4), which provides:

> No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person. . .to engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

Bates argues that there was insufficient evidence that he "removed" A.R. from the living room to the bedroom. We disagree.

{¶ 74} It is not necessary for the State to show that the defendant used "force" to remove or otherwise restrain the liberty of a child under the age of 13. Rather, the statute provides that the State need only show that the child's liberty was restrained by "any means." *State v. Weems*, 2016-Ohio-701, ¶ 25 (8th Dist.). Ohio courts have consistently held that in certain scenarios, especially those involving parent-child relationships, a child may feel compelled or psychologically coerced into submitting *Id.*, citing *State v. Eskridge*, 38 Ohio St.3d 56 (1988). Here, although Bates was not A.R.'s parent, he was in a romantic relationship with her aunt T.C., who fulfilled a parental role in A.R.'s life on a regular basis at the time of

the incident in this case.  Thus, the evidence that Bates ordered A.R. from the living room to the bedroom, a short time after raping her, particularly when viewed in the light most favorable to the State, is sufficient to show that Bates removed A.R. from the living room to the bedroom.  For these reasons, Bates's kidnapping conviction was supported by sufficient evidence.

{¶ 75} Bates's fifth and sixth assignments of error are overruled.

{¶ 76} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
EILEEN T. GALLAGHER, J., CONCUR